NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0157n.06
Filed: March 1, 2005

No. 03-4128

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DEBRA DANTZ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| AMERICAN APPLE GROUP, LLC, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| _____ | ) | |

Before: MARTIN and BATCHELDER, Circuit Judges, and O'MEARA, District Judge.[*]

JOHN CORBETT O'MEARA, District Judge. The plaintiff-appellant Debra Dantz is appealing the district court's decision to dismiss her action because her claims against her employer were subject to a mandatory and binding arbitration agreement. Dantz makes the following claims: (1) defendant Apple American Group LLP ("Apple") waived its right to arbitrate by removing the case to federal court; (2) the agreement to arbitrate lacked mutual assent; (3) the agreement lacked consideration; (4) the agreement is unconscionable; and (5) the agreement violates Ohio public policy. For the reasons stated below, we affirm.

## I. BACKGROUND

In July 2000 appellant Debra Dantz was hired as a server at the Applebee's restaurant in

_____

[*]The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

Akron, Ohio. The Akron restaurant, along with a number of Applebee's restaurants located around the country, is operated by Apple American Group, LLC. Dantz's supervisor was Michael Sanders, the restaurant manager and an Apple employee. Under Sanders' supervision, Dantz was allegedly denied certain minimum wage payments and made subject to a hostile work environment.

On October 1, 2001, Apple adopted a broad, mandatory dispute resolution process culminating in binding arbitration for employee claims against Apple, known as the "Apple American Group LLC Dispute Resolution Program" (the "Program"). The district court found that prior to that date, all Apple employees, including Dantz, "received copies of the Program and attended group training sessions relating to the Program." Dantz v. Apple Ohio LLC, 277 F. Supp. 2d 794, 796 (N.D. Ohio 2003). The record before us does not give us cause to find that the district court's understanding of the underlying facts was clearly erroneous.[1] As such, we adopt the district court's understanding of the factual background.

---

[1]On appeal, Dantz claims that she did not receive a copy of the Program until June 2002. The district court's understanding of the facts apparently relied on the affidavit of Seta Tchobanian, which stated, "In the Fall of 2001, the Company adopted the Program, to be effective October 1, 2001. The Program was distributed to all of the Company's employees, including Plaintiff, and group training sessions relating to the Program were conducted, including one attended by Plaintiff." J.A. at 26. Dantz notes that the second sentence of that excerpt has no date restrictions, making it vague whether the distribution and training sessions actually occurred in the fall of 2001. Dantz also claims that the Program booklet "that Apple submitted for the record - and now states was distributed in 'September 2001' - actually says '© 2002 Dispute Solutions, LLC.' (R.16 Apple's Ex. A, Apx. Pg. 64). It thus could not have been distributed in September 2001 with the Strang memorandum or even later in 'Fall 2001.'" Appellee's Reply Brief at 10.

However, Dantz's arguments are contradicted by her own filings before the district court. The Program booklet that Dantz herself submitted said "© 2001 Dispute Solutions, LLC." J.A. at 90. Moreover, in Dantz's Response to Defendant Apple American Group LLC's Motion to Stay Pending Arbitration, Dantz did not dispute that she received the program booklet prior to October 1, 2001. J.A. at 74-75. Indeed, Dantz stated, "In Fall 2001 Dantz's manager, Michael Sanders, placed before her a copy of 'Strang Corporation and Managed Companies Dispute Resolution Booklet' ('Booklet'). The Booklet, dated 2001, laid out the dispute resolution program and then at the end, contained an 'Agreement and Receipt for Dispute Resolution Program' ('Agreement')." J.A. at 75.

No. 03-4128
*Dantz v. Apple American Group, LLP*

In a letter to employees dated September 7, 2001, Apple President Don Strang III stated the following:

> We have therefore adopted, effective October 1, 2001, the Dispute Resolution Program that is detailed in the attached program summary. You will also be receiving Program Booklets. . . . From and after October 1, 2001, the Dispute Resolution Program will be the mandatory and exclusive means for resolving all work-related disputes. Please read the attached summary carefully. Your manager will conduct a meeting to discuss the Dispute Resolution Program and distribute Program Booklets to you. Please listen carefully to the presentation of the Program and feel free to ask questions – any questions.

> Your agreement to the program provisions, including arbitration, will be expressed by your continuing employment with the Company from and after October 1, 2001, by accepting any promotions, increases, transfers, bonuses or other benefits of employment, and by the Company's mutual promise to follow the Program's provisions, including those governing mandatory, binding arbitration.

J.A. at 73. The "attached program summary" referenced by Strang's letter is not in the record before this court.

The Program booklet outlines a four-step process for employee dispute resolution, culminating in mandatory binding arbitration. The following claims are subject to arbitration:

> Claims and disputes subject to arbitration include all those legal claims you may now or in the future have against the Company (and its successors or assigns) or against its officers, directors, shareholders, employees or agents. . . . and all claims that the Company may now or in the future have against you, whether or not arising out of your employment or termination, except as expressly excluded under the "Claims Not Subject to Arbitration" section below.

> The legal claims subject to arbitration include, but are not to be limited to:
> - claims for wages or other compensation;
> - claims for breach of any contract, covenant or warranty;
> - tort claims (including, but not limited to, claims for physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of employment);

3

- claims for wrongful termination;
- sexual harassment;
- discrimination (including, but not limited to, claims based on race, sex religion, national origin, age, medical condition or disability whether under federal, state or local law);
- claims for benefits or claims for damages or other remedies under any employee benefit program sponsored by the Company (after exhausting administrative remedies under the terms of such plans); and
- claims for a violation of any other non-criminal federal, state or other governmental law, statute, regulation or ordinance.

J.A. at 95-96.

Apple intended the Program to be mandatory and binding on all employees. On the first page, in bold capital letters, the Program booklet stated,

**THIS PROGRAM IS A CONDITION OF YOUR EMPLOYMENT AND IS THE MANDATORY AND EXCLUSIVE MEANS BY WHICH THOSE PROBLEMS MAY BE RESOLVED, SO READ THE INFORMATION IN THIS PROGRAM BOOKLET CAREFULLY.**

J.A. at 90. The booklet went on to note,

If either party pursues a legal claim covered by the Dispute Resolution Program in court by any means other than arbitration, the responding party shall be entitled to stay or dismissal of such action, the remand of such action to arbitration, and the recovery of all costs and attorney's fees and expenses related to such action.

J.A. at 98. In another provision, the booklet stated, "This program will prevent you from filing a lawsuit in Court for individual relief for a legal claim subject to arbitration." J.A. at 99.

The Program requires Apple to submit any claims it has against employees to binding arbitration. This provision is irrevocable under the terms of the Program.

Apple also distributed a separate, two-page "Agreement and Receipt for Dispute Resolution Program" ("Agreement"). It is unclear from the record when the two-page

4

No. 03-4128
*Dantz v. Apple American Group, LLP*

Agreement was given to Dantz.[2]  The Agreement stated, in part,

> **MUTUAL PROMISE TO RESOLVE CLAIMS BY BINDING ARBITRATION**.  In signing this Agreement, both the Company and I agree that all legal claims or disputes covered by the Agreement must be submitted to binding arbitration. . . . I understand and agree that by entering into this Agreement, I anticipate gaining the benefits of a speedy, impartial dispute resolution procedure.  This procedure is explained in the Dispute Resolution Program Booklet, which I acknowledge I have received and read or have had an opportunity to read. . . .
>
> **SOLE AND ENTIRE AGREEMENT.**  This Agreement and the Dispute Resolution Program are the complete agreement of the parties on the subject of arbitration of disputes.  This Agreement takes the place of any other verbal or written understanding on this subject.  No party is relying on any statements, oral or written, on the subject of arbitration or the effect, enforceability or meaning of this Agreement, except as specifically stated in this Agreement.
>
> **VOLUNTARY AGREEMENT.**  I acknowledge that I have carefully read this agreement, I understand its terms, that all understandings and agreements between the Company and me relating to the subjects covered in this Agreement are contained in it, and that I have entered into the Agreement voluntarily and not in reliance on any other promises or representations by the Company other than those in the Agreement itself and the Dispute Resolution Program.

J.A. at 100-101.

On July 2, 2002, Dantz wrote on the two-page Agreement, at the place provided for her signature, "I cannot sign this as I would be lying.  An attorney contacted me in regard to certain legal issues."  J.A. at 26.  She then signed and dated the document.  Id.

In January 2003 Dantz filed an eight-count complaint against Apple in Ohio state court, alleging violations of the federal Fair Labor Standards Act and the Ohio Minimum Fair Wage

---

[2]Dantz's stance before the district court appeared to be that she received the two-page Agreement in Fall 2001, J.A. at 75-76, but her appellate brief claims she first received it in June 2002, attached to the Program booklet. Appellant's Brief at 5.

5

Standards Act. Dantz alleged unjust enrichment, sexual harassment, negligent retention, retaliation, promissory estoppel, breach of implied contract, and spoliation of evidence. Apple removed the case to the United States District Court for the Northern District of Ohio, filed an answer, and moved that the district court stay proceedings pending arbitration. The district court construed Apple's motion as a motion to compel arbitration and granted the motion on July 21, 2003. Rather than granting a stay, the district court dismissed Dantz's action. It remanded to state court two counts against Michael Sanders individually. Dantz subsequently filed this appeal.

## II. ANALYSIS

A party may appeal "a final decision with respect to an arbitration" under the Federal Arbitration Act ("FAA"). 9 U.S.C. § 16. The appellate court reviews *de novo* the district court's decisions regarding the existence of a valid arbitration agreement and the arbitrability of a particular dispute. Floss v. Ryan's Family Steakhouses, Inc., 211 F.3d 306, 311 (6th Cir. 2000). The existence of an agreement to arbitrate is governed by state law. Id. at 314; First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Thus, Ohio contract law governs the enforceability of the alleged agreement to arbitrate in this case.

Dantz raises a number of challenges to the enforceability of the arbitration agreement. We will discuss these claims in turn.

### A. Waiver by Removal to Federal Court

Relying on recent United States Supreme Court precedent regarding states' waiver of federal sovereign immunity, Dantz argues that Apple waived its right to arbitrate by removing

the case to federal court. The Supreme Court held in Lapides v. Board of Regents of the Univ. Sys. of Georgia, 535 U.S. 613 (2002), that by voluntarily invoking the jurisdiction of the federal court through removal, the State of Georgia waived its federal sovereign immunity. In Lapides, Georgia attempted to remove a case from state court, where its sovereign immunity had been waived by state statute, to federal court, where Georgia claimed sovereign immunity still existed. The Court, worried about "unfair tactical advantages," unanimously held that Georgia had waived its federal sovereign immunity. Id. at 621. The holding was limited "to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings." Id. at 617.

Under the FAA, a party can waive a right to arbitrate. American Locomotive Co. v. Gyro Process Co., 185 F.2d 316, 318 (6th Cir. 1950). Moreover, waiver can be implied by a defendant's actions in pursuing litigation. Id. at 317, 320 (holding that a party waived its arbitration right when it requested arbitration after it litigated "numerous motions and proceedings" and engaged in extensive discovery over a period of seven years). However, mere removal of a case to federal court, and nothing more, does not constitute waiver of a defendant's right to arbitration. See Williams v. Cigna Fin. Advisors, 56 F.3d 656 (5th Cir. 1995) (holding that a defendant did not waive its arbitration right when it removed an action to federal court, filed a compulsory counterclaim, and engaged in discovery after a motion to stay discovery was denied).

Dantz admits that Lapides "has been primarily applied to cases involving the Eleventh Amendment," and cites one case, Obermaier v. Kenneth Copeland Evangelistic Ass'n, Inc., 208

F. Supp. 2d 1288, 1290 (M.D. Fla. 2002), that briefly considered <u>Lapides</u> in a private law context.[3]  In <u>Obermaier</u>, the district court distinguished <u>Lapides</u> but did not completely reject its use in a private law context.  Regardless, <u>Obermaier</u> offers no support for Dantz's claim that <u>Lapides</u> should extend beyond the realm of sovereign immunity.

We refuse to extend <u>Lapides</u> beyond the sovereign immunity context.  Even if <u>Lapides</u> did apply, the potentially unfair litigation tactics the Court was concerned with in <u>Lapides</u> are not present in this case.  There is no evidence that an Ohio state court would have treated this case any differently than the federal court would have.[4]

## B.    Mutual Assent

Dantz argues that she did not agree to be bound by the terms of the Program.  Under Ohio law, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  <u>Harmon v. Phillip Morris, Inc.</u>, 697 N.E.2d 270, 271 (Ohio Ct. App. 1997) (quoting <u>AT&T Tech., Inc. v. Communication Workers of America</u>, 475 U.S. 643 (1986)).  Ohio law requires mutual assent to form a valid contract.  <u>Id.</u> (quoting Restatement (Second) of Contracts §17 (1981)).  Mutual assent "ordinarily takes the form of an *offer* or proposal by one party

---

[3]In her reply brief, Dantz also cites another case that expanded <u>Lapides</u> outside the Eleventh Amendment, <u>Kenny A. v. Perdue</u>, No. 1:02-cv-1686-MHS, 2003 U.S. Dist. LEXIS 21205 (N.D.Ga. Aug. 18, 2003).  <u>Kenny A.</u>, however, again dealt with issues of federalism closely related to the Eleventh Amendment.  In that case, a state removed an action to federal court and then attempted to claim that the <u>Younger</u> abstention doctrine required that the federal court abstain.

[4]Dantz claims that "the Ninth District Court of Appeals of Ohio, which originally had jurisdiction over this case, requires additional consideration for agreement formation, even where employment is at will, rather than mere continued employment."  Appellant's Reply Brief at 1.  However, sufficient additional consideration outside of her continued employment existed, consistent with Ohio law.  <u>See</u> discussion of consideration, <u>infra</u>.  Moreover, the federal court looks to Ohio state law to determine if the agreement is valid.  Both the Ohio courts and federal courts should rule exactly the same on the issues of contract formation.  The difference in applicable law based on the choice of forum that potentially existed in <u>Lapides</u> is not present here.

followed by an *acceptance* by the other party or parties."    Id. (quoting Restatement (Second) of Contracts § 22 (1981)).

The district court found that Apple made an offer for a unilateral contract, which Dantz accepted by performance. The Program booklet set out the terms of the arbitration agreement and made it an explicit condition of her employment. Strang's September 7 letter further set out the manner of acceptance – continued employment after October 1, 2001. The district court held that "plaintiff, an at-will employee, manifested her assent in the very way that the Company requested, that is, by continuing her employment after October 1, 2001." Dantz, 277 F. Supp. 2d at 801. On the facts in the record before us, we agree with the analysis of the district court. Mutual assent is manifested by Dantz's continued employment after having been told explicitly that the arbitration agreement was a condition of her employment.[5] Cf. Lake Land Employment Group of Akron, LLC v. Columber, 804 N.E.2d 27, 32 (Ohio 2004) (noting that "an employer or an employee in an at-will relationship may propose to change the terms of their employment relationship at any time. If, for instance, an employer notifies an employee that the employee's compensation will be reduced, the employee's remedy, if dissatisfied, is to quit.")

**C. Consideration**

---

[5]Mutual assent for the agreement to arbitrate would exist even under Dantz's version of the facts in her appellate briefs. According to Dantz, she was given the Program booklet in June 2002. The Program booklet made binding mandatory arbitration a condition of her employment. The Program covered all claims she had at the time of agreement, as well as any claims she might have in the future. Dantz continued to work for Apple after June 2002 and did not file suit in federal court until months later. Her mutual assent was expressed by her continued employment.

Ohio law requires that consideration be present for a contract to be enforceable. Harmon, 697 N.E.2d at 271 (quoting Restatement (Second) of Contracts § 17 (1981)). Under Ohio law, "to constitute consideration, a performance or a return promise must be bargained for." Id. (quoting Restatement (Second) of Contracts § 71(1) (1981)). "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." Id. at 271-72 (quoting Restatement (Second) of Contracts § 71(2) (1981)). "The performance may consist of (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification, or destruction of a legal relation." Id. at 272 (quoting Restatement (Second) of Contracts § 71(2) (1981)). "Consideration may consist of either a detriment to the promisee or a benefit to the promisor. A benefit may consist of some right, interest or profit accruing to the promisor, while a detriment may consist of some forbearance, loss or responsibility given, suffered or undertaken by the promisee." Id. (quoting Brads v. First Baptist Church, 624 N.E.2d 737, 743 (Ohio Ct. App. 1993)).

The Harmon court found consideration was not present in a binding arbitration agreement that required employees to arbitrate their claims against the employer but did not require the employer to arbitrate its claims against its employees. Id. In this case, however, Apple is bound to arbitrate its claims against employees. The district court noted,

> [B]oth the employee and the employer are required to take certain defined disputes to arbitration and be bound by the outcome. Further, although the Company retained the right to change many of its policies without any notice to its employees, it specifically prohibited itself from making any changes to the mandatory arbitration policy. The reciprocal agreement, coupled with the prohibition on making changes, was clearly a detriment to the Company which constituted valid and sufficient consideration to support the arbitration agreement.

<u>Dantz</u>, 277 F. Supp. 2d at 804.

We agree with the district court's reasoning. We note also that the Ohio Supreme Court has recently ruled that continued employment alone was sufficient consideration to support a noncompetition agreement between an employer and an employee. <u>Lake Land Employment Group</u>, 804 N.E.2d at 31-32. Accordingly, Dantz's continued employment with Apple was sufficient consideration under Ohio law.

**D. Unconscionability**

Under Ohio law, a contract must be found both procedurally and substantively unconscionable before a court will deem it unenforceable. <u>Morrison v. Circuit City Stores, Inc.</u>, 317 F.3d 646, 666 (6th Cir. 2003). A recent *en banc* opinion of this court summarized the requirements for procedural unconscionability as follows:

> In determining procedural unconscionability, Ohio courts look to factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible. The crucial question is whether each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print . . . ?

<u>Id.</u> (citations omitted).

In this case, the circumstances surrounding the contracting were not procedurally unconscionable. Apple certainly had a far superior bargaining position, and the terms were not negotiable. Regardless, the Program booklet clearly laid out the terms of the arbitration agreement; and Apple provided training sessions for employees to learn how the Program

operated.  Indeed, Dantz's attempt to refuse to assent to the terms of the contract after she

consulted with an attorney is conclusive evidence that she understood the terms of the

agreement.

Given the lack of procedural unconscionability, we need not reach the issue of

substantive unconscionability.  See Morrison, 317 F.3d at 666-67.

**E. Public Policy**

Finally, Dantz argues that the Program violates Ohio public policy because it requires her

to relinquish her statutory rights or quit her job.  Dantz cites a number of cases holding that the

waiver of rights under Ohio and federal law requires informed consent and consideration if the

waiver is by contract.  See Parente v. Day, 241 N.E.2d 280 (Ohio Ct. App. 1968); Shipe v.

Norfolk & W. Ry. Co., 1 N.E.2d 174 (Ohio 1935); Brophy v. Cincinnati, New Orleans & Texas

Pac. Ry. Co., 855 F. Supp. 213 (S.D. Ohio 1994); Adams v. Philip Morris, Inc., 67 F.3d 580 (6th

Cir. 1995).  Dantz argues that her right to litigate in a judicial forum has been waived

improperly, violating Ohio public policy.  This essentially echoes her contract formation

arguments, and does not add a new public policy reason to hold the Program unenforceable.

Dantz also cites Collins v. Rizkana, 652 N.E.2d 653 (Ohio 1995), which establishes the

tort of wrongful discharge in Ohio.  Collins offers no support for Dantz's assertion that an Ohio

court would strike down this arbitration agreement as violative of public policy.  In fact, Ohio

has

a strong public policy in favor of agreements to arbitrate in general.  <u>Williams v. Aetna Fin. Co.</u>,

700 N.E.2d 859, 865 (Ohio 1998).

### III.  SUMMARY

Apple's removal to federal court did not waive its right to arbitrate. Dantz assented to a

unilateral contract with her continued employment.  Adequate consideration existed in the

mutual and irrevocable promises to arbitrate claims.  Finally, the circumstances surrounding the

agreement to arbitrate were not procedurally unconscionable, and the agreement does not violate

Ohio public policy.  We **AFFIRM** the judgment of the district court.