EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Enrique Aponte Valentín; Ángel Arroyo Arocho; José L. Candelario Lozada; Juan O. Clavell Santiago; Juan A. Feliciano Esperanza; Hugo O. Fernández Collazo; Félix L. Figueroa Rodríguez; Arturo Flores Aguayo; Wilfredo Fuentes Félix; Ernesto González Maldonado; Javier A. Maldonado Pérez; Luis A. Manatou Hernández; Carlos A. Meléndez Cosme; Roberto Ortega Hernández; Jorge L. Pagán Ginés; Héctor Parés Santiago; José A. Pérez Moyeno; Manuel Pérez Santos; Efraín A. Pérez Vélez; Armando Rivera García; Ángel L. Rodríguez Rivera; Héctor M. Vázquez Ortiz; Ángel L. Vázquez Rodríguez; Pedro L. Vega Tirado; Maxie Vélez Burgos<br><br>Recurridos<br><br>v.<br><br>Pfizer Pharmaceuticals, LLC<br><br>Peticionaria | Certiorari<br><br>2021 TSPR 148<br><br>208 DPR \_\_\_\_ |

Número del Caso: CC-2018-748

Fecha: 10 de noviembre de 2021

Tribunal de Apelaciones:

    Panel X

Abogados de la parte peticionaria:

    Lcdo. Juan Felipe Santos
    Lcda. Sara E. Colón-Acevedo

Abogados de la parte recurrida:

    Lcdo. Carlos J. Morales Bauzá
    Lcdo. Luis R. Mellado-González

Materia: Obligaciones y contratos: Continuidad en el empleo constituye una forma válida de consentir tácitamente a un acuerdo de arbitraje, por lo que no será necesario para su validez que el acuerdo de arbitraje esté firmado por las partes.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Enrique Aponte Valentín; Ángel Arroyo Arocho; José L. Candelario Lozada; Juan O. Clavell Santiago; Juan A. Feliciano Esperanza; Hugo O. Fernández Collazo; Félix L. Figueroa Rodríguez; Arturo Flores Aguayo; Wilfredo Fuentes Félix; Ernesto González Maldonado; Javier A. Maldonado Pérez; Luis A. Manatou Hernández; Carlos A. Meléndez Cosme; Roberto Ortega Hernández; Jorge L. Pagán Ginés; Héctor Parés Santiago; José A. Pérez Moyeno; Manuel Pérez Santos; Efraín A. Pérez Vélez; Armando Rivera García; Ángel L. Rodríguez Rivera; Héctor M. Vázquez Ortiz; Ángel L. Vázquez Rodríguez; Pedro L. Vega Tirado; Maxie Vélez Burgos<br><br>Recurridos<br><br>v.<br><br>Pfizer Pharmaceuticals, LLC<br><br>Peticionaria | CC-2018-748 | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado SEÑOR FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 10 de noviembre de 2021.

Como cuestión de umbral, nos corresponde resolver si en el caso de epígrafe existe un acuerdo de arbitraje válido sujeto a la Ley Federal de Arbitraje, *infra*. Adelantamos que sí. Particularmente, en el día de hoy pautamos que -en nuestro ordenamiento- la continuidad en

el empleo constituye una forma válida de consentir tácitamente a un acuerdo de arbitraje, por lo que, en circunstancias como las del presente caso, no será necesario para su validez que el acuerdo de arbitraje esté firmado por las partes.[1] Ante la ausencia de hechos materiales en controversia y por los fundamentos que discutimos en esta Opinión, revocamos el dictamen recurrido y reinstalamos la *Sentencia* desestimatoria del Tribunal de Primera Instancia, pues existe un acuerdo de arbitraje válido al amparo de la Ley Federal de Arbitraje, *infra*, cuyas cláusulas debemos hacer valer según sus términos.

A continuación, relatamos los hechos que dieron lugar a la controversia del caso.

## I.    Tracto fáctico y procesal

En mayo de 2016, Pfizer Pharmaceuticals, LLC (parte peticionaria o Pfizer) adoptó un programa de arbitraje compulsorio para sus empleados al amparo de la Ley Federal de Arbitraje, *infra*. Así, el 5 y 6 de mayo de 2016, y el 4 de junio del mismo año, los empleados fueron notificados -por correo electrónico- sobre los términos del referido

---

[1] Advertimos que los eventos fácticos y procesales del presente caso ocurrieron durante la vigencia del Código Civil de 1930, según enmendado, 31 LPRA ant. sec. 1 *et seq*. Por consiguiente, el análisis realizado se ampara en las disposiciones de dicho estatuto y su jurisprudencia interpretativa. No obstante, destacamos que los cambios incluidos en el nuevo Código Civil de Puerto Rico de 2020 no afectan nuestro análisis jurídico en esta Opinión. "La [nueva] norma recoge el principio establecido [de] que el consentimiento puede darse por otros medios distintos a los tradicionales (verbales o escritos), pues en nuestro sistema el consentimiento puede presentarse de cualquier forma […]". L. Muñiz Argüelles y otros, *El Código Civil de Puerto Rico de 2020: Primeras impresiones*, San Juan, Ed. Fideicomiso para la Escuela de Derecho de la Universidad de Puerto Rico, 2021, pág. 198.

programa. En estas comunicaciones, Pfizer envió los enlaces con acceso al *Acuerdo de Arbitraje Mutuo y Renuncia a Demanda de Clase* (Acuerdo), así como una lista de preguntas y respuestas frecuentes, un módulo de adiestramiento y un acuse de recibo electrónico.

El Acuerdo disponía que, como condición para la continuidad del empleo en Pfizer, todas las reclamaciones relacionadas con el trabajo -incluyendo aquellas sobre despido injustificado- debían resolverse mediante arbitraje, limitando así las reclamaciones colectivas. También exponía que, si el empleado comenzaba a trabajar o continuaba trabajando para Pfizer sesenta (60) días después de recibir el Acuerdo, la aceptación del empleo o la permanencia en el mismo serían consideradas como un consentimiento al Acuerdo.

Así las cosas, el 18 de julio de 2017, el Sr. Enrique Aponte Valentín y otros veinticuatro (24) querellantes (en adelante los recurridos) presentaron ante el Tribunal de Primera Instancia una *Querella* sobre despido injustificado en contra de Pfizer al amparo de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la *Ley de indemnización por despido sin justa causa*, 29 LPRA sec. 185a *et seq.* (Ley Núm. 80).[2] Los recurridos se acogieron al trámite dispuesto por la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, conocida como la *Ley de*

---

[2]   Véase *Querella*, Apéndice del *Certiorari*, págs. 25-32.

*procedimiento sumario de reclamaciones laborales*, 32 LPRA sec. 3118 *et seq.*

En esencia, los recurridos adujeron que fueron contratados por Pfizer para trabajar por tiempo indefinido.[3] Asimismo, alegaron que -previo a octubre de 2016- Pfizer les informó que cada uno de ellos sería objeto de un traslado involuntario a otro patrono (Sodexo).[4] Por ende, los recurridos aseveraron que el traslado involuntario constituyó un despido injustificado conforme a la Ley Núm. 80.[5]

Oportunamente, el 31 de julio de 2017 Pfizer presentó su *Contestación a querella* ante el foro de instancia. En lo pertinente al asunto que nos ocupa, invocó como defensa afirmativa la falta de jurisdicción sobre la materia.[6] En ese sentido, Pfizer adujo que los recurridos se sometieron al Acuerdo en el cual pactaron resolver todas las reclamaciones relacionadas con su empleo mediante el proceso de arbitraje.[7]

Luego de varios trámites procesales, el 16 de agosto de 2017 Pfizer presentó una *Moción de desestimación de la querella por falta de jurisdicción por virtud de acuerdo de arbitraje y en solicitud de orden*. En ese escrito, la parte peticionaria reiteró la falta de jurisdicción del

---

[3]  Véase *Querella*, Apéndice del *Certiorari*, pág. 26.

[4]  Íd., pág. 27.

[5]  Íd., pág. 28.

[6]  Véase *Contestación a querella*, Apéndice del *Certiorari*, pág. 37.

[7]  Íd.

tribunal de instancia sobre la materia por existir un acuerdo de arbitraje válido suscrito entre las partes. Además, aseveró que las cláusulas del Acuerdo se regían por la Ley Federal de Arbitraje, *infra*.[8]

Específicamente, Pfizer adujo que, a tenor con los términos del programa de arbitraje compulsorio implementado como condición del empleo, se entendía que los empleados prestaban su consentimiento al Acuerdo si continuaban trabajando para la compañía sesenta (60) días después de recibirlo.[9] Por consiguiente, afirmó que los recurridos aceptaron tácitamente resolver las reclamaciones relacionadas con su empleo mediante el proceso de arbitraje al continuar en la empresa sesenta (60) días después de ser notificados sobre los términos del Acuerdo.[10]

Luego de múltiples trámites procesales, el 27 de febrero de 2018 los recurridos presentaron una *Oposición a moción de desestimación y/o de sentencia sumaria*. En resumen, los recurridos negaron la existencia del Acuerdo. En específico, alegaron que no existía un contrato de arbitraje escrito y firmado por cada uno de los recurridos.[11] De igual forma, afirmaron que ninguno de los

---

[8] Véase *Moción de desestimación de la querella por falta de jurisdicción por virtud de acuerdo de arbitraje y en solicitud de orden*, Apéndice del *Certiorari*, pág. 42.

[9] Íd., págs. 43-45.

[10] Íd., pág. 50.

[11] Véase *Oposición a moción de desestimación y/o de sentencia sumaria*, Apéndice del *Certiorari*, págs. 368-369.

recurridos prestó su consentimiento, por lo que el mismo no era válido ni exigible.[12] En consecuencia, los recurridos adujeron que no existía un convenio de arbitraje válido suscrito con Pfizer que los obligara a arbitrar sus reclamos al amparo de la Ley Núm. 80.[13]

En atención a la solicitud realizada por los recurridos,[14] el tribunal de instancia acogió la moción de desestimación presentada por Pfizer como una solicitud de sentencia sumaria.[15] Luego de otras incidencias procesales, que incluyeron la presentación de una *Réplica a Oposición a moción de desestimación*,[16] el Tribunal de Primera Instancia emitió una *Sentencia* -notificada el 18 de mayo de 2018- en la que formuló las siguientes determinaciones de hechos incontrovertidos:

> 1. Los querellantes son las siguientes personas: (1) Enrique Aponte Valentín; (2) Ángel L. Arroyo Arocho; (3) José L. Candelario Lozada; (4) Juan O. Clavell Santiago; (5) Juan A. Feliciano Esperanza; (6) Hugo O. Fernández Collazo; (7) Félix L. Figueroa Rodríguez; (8) Arturo Flores Aguayo; (9) Wilfredo Fuentes Félix; (10) Ernesto [González Maldonado]; (11) Javier A. Maldonado Pérez; (12) Luis A. Manatou Hernández; (13) Carlos A. Meléndez Cosme; (14) Roberto Ortega Hernández; (15) Jorge L. Pagán Ginés;

---

[12] Véase *Oposición a moción de desestimación y/o de sentencia sumaria*, Apéndice del *Certiorari*, pág. 368.

[13] Íd., pág. 376.

[14] Véase *Moción para que se considere la moción de desestimación de la querella como una de sentencia sumaria y en solicitud de prórroga para replicar la misma*, Apéndice del *Certiorari*, págs. 351-353.

[15] Véase *Orden* del Tribunal de Primera Instancia, Apéndice del *Certiorari*, pág. 354.

[16] Véase *Réplica a oposición a moción de desestimación*, Apéndice del *Certiorari*, págs. 438-547.

(16) Héctor Parés Santiago; (17) José A. Pérez Moyeno; (18) Manuel Pérez Santos; (19) Efraín A. Pérez Vélez; (20) Armando Rivera García; (21) Ángel L. Rodríguez Rivera; (22) Héctor M. Vázquez Ortiz; (23) Ángel L. Vázquez Rodríguez; (24) Pedro L. Vega Tirado; y (25) Maxie Vélez Burgos.

2.    La querellada, Pfizer Pharmaceuticals, LLC, es una Corporación de Delaware con fines de lucro y está autorizada a realizar negocios en el Estado Libre Asociado de Puerto Rico.

3.    El 5 de mayo de 2016, Pfizer adoptó un programa de arbitraje compulsorio y notificó a todos los empleados, mediante correo electrónico, los términos del Acuerdo de Arbitraje y se envió el enlace del Acuerdo de Arbitraje Mutuo y Renuncia a Demanda de Clase, así como una lista de preguntas y respuestas frecuentes (FAQ).

4.    Todos los querellantes de epígrafe aceptaron, mediante declaración jurada, que mientras fueron empleados de Pfizer se le asignó a cada uno una dirección de correo electrónico, a la cual llegaban mensajes que la compañía enviaba y en la cual recibían correos de sus supervisores con información y/o instrucciones relacionad[a]s al trabajo y dicho correo solamente podía verificarse en horas laborables.

5.    El 6 de mayo de 2016, Pfizer envió otro correo electrónico a los querellantes con el enlace al Acuerdo de Arbitraje Mutuo y Renuncia a Demanda de Clase, incluyendo el enlace al recibo electrónico y al adiestramiento.    En las comunicaciones enviadas a los querellantes se les indicó:

*As a condition of your employment with Pfizer, you and Pfizer agree to individual arbitration as the exclusive means of resolving certain disputes relating to your employment.  This agreement is contained in the Mutual Arbitration and Class Waiver Agreement.  It is important that you are aware of the terms of this Agreement.*

6.    El 4 de junio de 2016, Pfizer envió otro correo electrónico a los querellantes, indicándoles lo siguiente:

*This is a reminder that you have 30 days to complete the following assigned activity. You have been assigned the activity Mutual Arbitration and Class Waiver Agreement and Acknowledgement* (Acuerdo de Arbitraje Mutuo y Renuncia a Demanda Colectiva y acuse de recibo […]). *It is important that you are aware of the terms of this Agreement.*

7.    El Acuerdo de Arbitraje Mutuo informaba a los empleados, entre otras cosas, que:

Con excepción de lo expresamente establecido en la Sección 3, titulada, "Reclamaciones no cubiertas por el presente Acuerdo", la totalidad de las disputas, reclamaciones, quejas o controversias ("Reclamaciones") que tenga ahora o que pudiera tener en cualquier momento en el futuro contra Pfizer y/o cualquiera de sus compañías matrices, subsidiarias, filiales, predecesoras, sucesoras, cesionarios, funcionarios actuales o anteriores, directores, empleados y/o aquellas personas que actúan como agentes de la Compañía [(que constituyen la definición de "Compañía"), o que la Compañía] tenga contra usted ahora o en algún momento futuro, entre los que se encuentran las reclamaciones relacionadas con incumplimiento de contrato, reclamaciones extracontractuales, **despido injustificado**, reclamaciones por discriminación y/o acoso, reclamaciones por represalias, por horas extras, salarios, licencias/permisos, licencias pagadas, ausencia por enfermedad, compensación, sanciones o restitución… **están sujetas a arbitraje conforme a los términos […] del presente Acuerdo y se resolverán mediante arbitraje y NO mediante un tribunal o un jurado**. Por el presente instrumento las partes renuncian definitivamente al derecho de que un juez o jurado decida cualquiera de las reclamaciones cubiertas. Cualquiera de las partes en el presente Acuerdo puede solicitar a un tribunal una medida cautelar temporal o preliminar para asegurar el

cumplimiento del arbitraje o para mantener el *status quo* del arbitraje pendiente, si el laudo al cual la parte puede tener derecho pueda considerarse ineficaz sin dicha medida.

8. Pfizer notificó a sus empleados, incluyendo a los querellantes, que podían consultar el Acuerdo con un abogado y se les proveyó tiempo para considerar el mismo.

9. Los querellantes, Efraín Pérez Vélez, Ángel Vázquez Rodríguez y Pedro L. Vega Tirado, expresamente acusaron recibo electrónico del Acuerdo de Arbitraje y tomaron el adiestramiento del mismo.

10. **Todos los querellantes continuaron trabajando para la empresa sesenta (60) días, luego de recibir el Acuerdo de Arbitraje**. (Énfasis suplido y bastardillas nuestras).[17]

En síntesis, el Tribunal de Primera Instancia determinó que no era necesaria la firma de las partes en el Acuerdo y que simplemente se requería que el mismo constara por escrito.[18] Igualmente, el foro de instancia razonó que, al no existir una prohibición para establecer como condición de la continuación en el empleo que un empleado sea sometido al proceso de arbitraje compulsorio, la mera permanencia en el empleo evidenciaba el consentimiento tácito por parte de los recurridos al Acuerdo.[19]

El Tribunal de Primera Instancia señaló que los recurridos entendían la importancia de acceder a sus

---

[17] Véase *Sentencia* del Tribunal de Primera Instancia, Apéndice del *Certiorari*, págs. 572-574.

[18] Íd., pág. 581.

[19] Íd., pág. 582.

cuentas de correo electrónico para recibir información y documentos relacionados a sus labores.[20] También destacó que cada recurrido podía seleccionar el idioma de su preferencia para recibir las comunicaciones.[21] Así pues, el foro de instancia determinó que los recurridos recibieron el Acuerdo mediante correo electrónico y que la alegación de no recordar haberlo leído era insuficiente para negarlo.[22] Por tanto, el Tribunal de Primera Instancia desestimó con perjuicio la causa de acción de los recurridos por falta de jurisdicción sobre la materia.[23]

Inconformes, los recurridos recurrieron ante el Tribunal de Apelaciones para solicitar la revocación de la *Sentencia* del Tribunal de Primera Instancia.[24] Tras la comparecencia en oposición de Pfizer, el foro apelativo intermedio notificó una *Sentencia* el 23 de julio de 2018, por medio de la cual revocó la *Sentencia* emitida por el Tribunal de Primera Instancia.[25]

El foro apelativo intermedio determinó que los hechos formulados por el foro de instancia no estaban en

---

[20]   Véase *Sentencia* del Tribunal de Primera Instancia, Apéndice del *Certiorari*, pág. 581.

[21]   Íd., pág. 581.

[22]   Íd., págs. 582-583.

[23]   Íd., pág. 583.

[24]   Véase *Certificación de notificación*, Apéndice del *Certiorari*, págs. 594-596.

[25]   Véase *Sentencia* del Tribunal de Apelaciones, Apéndice del *Certiorari*, págs. 628-641.

controversia.**26**    Sin embargo, entendió que los recurridos

controvirtieron el consentimiento sobre el Acuerdo.    En

particular, el foro apelativo intermedio expresó lo

siguiente:

> […] encontramos que los apelantes presentaron declaraciones juradas que contienen hechos específicos, de los cuales tienen conocimiento personal, en los cuales alegan, en síntesis, que aceptaron el traslado por temor a perder el empleo; que no recibieron el correo electrónico en controversia; que recibieron el correo electrónico en cuestión, pero no estuvieron de acuerdo y así lo manifestaron, pero que un funcionario de Pfizer les informó que el Acuerdo de Arbitraje Mutuo era una condición para continuar en el empleo y que si continuaban trabajando con Pfizer, el acuerdo de arbitraje sería vinculante; que nunca suscribieron documento alguno al respecto; que no consintieron al arbitraje compulsorio[,] y que nunca asistieron a alguna reunión en la que se discutiera el acuerdo de arbitraje.**27**

El Tribunal de Apelaciones adjudicó la controversia en

el contexto de un marco normativo sustantivo y procesal

favorable a los recurridos al amparo de la Ley Núm. 80 y la

Regla 36 de Procedimiento Civil, *infra*.**28** En consecuencia,

revocó la *Sentencia* recurrida y devolvió el caso al Tribunal

de Primera Instancia para la celebración de una vista

evidenciaria en la que se estableciera el consentimiento de

los recurridos al Acuerdo.**29**

---

**26** Véase *Sentencia* del Tribunal de Apelaciones, Apéndice del *Certiorari*, pág. 641.

**27** Íd., págs. 639-640.

**28** Íd., pág. 639.

**29** Íd., pág. 641.

Inconforme con la *Sentencia* emitida por el Tribunal de Apelaciones, Pfizer acudió ante este Foro consignando los siguientes señalamientos de error:

1. Erró el [Tribunal de Apelaciones] al determinar que existe controversia sobre el consentimiento de los recurridos al acuerdo de arbitraje y al negarse a validar el consentimiento prestado por [é]stos ante el hecho material incontrovertido de que éstos permanecieron como empleados por mucho más de 60 días de haber recibido el acuerdo de arbitraje.

2. Erró el [Tribunal de Apelaciones] al revocar la decisión del [Tribunal de Primera Instancia] y no poner en vigor el acuerdo de arbitraje válido, indicando erróneamente que procede una interpretación liberal a favor de los trabajadores porque estamos ante un estatuto reparador cuando dicho estándar contraviene el mandato del Tribunal Supremo de los Estados Unidos en acuerdos de arbitraje bajo el [*Federal Arbitration Act*].

3. Erró el [Tribunal de Apelaciones] al determinar que existen hechos en controversia que impiden dictar sentencia sumaria y requieren la celebración de una vista evidenciaria a pesar de que los hechos materiales esbozados en la Sentencia del [Tribunal de Primera Instancia] permanecen incontrovertidos conforme resolvió el [Tribunal de Apelaciones] y evidencian el consentimiento de los recurridos.[30]

Luego de expedir el auto de *certiorari* solicitado, y con el beneficio de los alegatos de las partes al igual que las comparecencias de la Sociedad para la Gerencia de Recursos Humanos-Capítulo de Puerto Rico, la Asociación de Industriales de Puerto Rico y la Industria Farmacéutica de Puerto Rico, Inc. en calidad de *amicus curiae*, resolvemos.

---

[30] *Certiorari*, págs. 9-10.

## II. Derecho aplicable

### A. La sentencia sumaria

La Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, regula todo lo concerniente a la sentencia sumaria. El propósito de este mecanismo es disponer ágilmente de aquellos casos en los que no estén presentes hechos materiales en controversia que requieran de la celebración de un juicio en su fondo. Rivera Matos et al. v. Triple-S et al., 204 DPR 1010, 1024 (2020); Rodríguez García v. UCA, 200 DPR 929, 940 (2018); Ramos Pérez v. Univisión, 178 DPR 200, 213 (2010).

De la prueba que acompaña la sentencia sumaria debe surgir de manera preponderante que no existe controversia sobre hechos medulares del caso. Zambrana García v. ELA et al., 204 DPR 328, 341-342 (2020); Jusino et als. v. Walgreens, 155 DPR 560, 577 (2001). Por ende, cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una que permita concluir la existencia de una controversia real y sustancial sobre hechos relevantes y pertinentes. Abrams Rivera v. E.L.A., 178 DPR 914, 932 (2010); Nieves Díaz v. González Massas, 178 DPR 820, 848 (2010); Ramos Pérez v. Univisión, supra, pág. 214.

Reiteradamente, "hemos definido que un hecho material es aquel que, de acuerdo con el derecho aplicable, puede alterar la forma en que se resuelve un caso". Zambrana

García v. ELA et al., *supra*, pág. 341; Meléndez González et al. v. M. Cuebas, 193 DPR 100, 110 (2015). Así pues, "[e]n ausencia de una controversia de hechos materiales, el tribunal dictará sentencia si procede en derecho". Rivera Matos et al. v. Triple-S et al., *supra*, pág. 1024 (haciendo referencia a Rodríguez García v. UCA, *supra*, pág. 940; Savary et al. v. Mun. Fajardo et al., 198 DPR 1014 (2017)).

Por otra parte, hemos señalado que no es aconsejable dictar sentencia sumaria en casos cuyas controversias versan esencialmente sobre asuntos de credibilidad o envuelven aspectos subjetivos, como lo es la intención, propósitos mentales o negligencia. Ramos Pérez v. Univisión, *supra*, pág. 219. Véase, además, Soto v. Hotel Caribe Hilton, 137 DPR 294, 301 (1994). **No obstante, ello no impide la utilización del mecanismo de sentencia sumaria en reclamaciones que requieren elementos subjetivos o de intención cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales.** Ramos Pérez v. Univisión, *supra*, pág. 219; Nieves Díaz v. González Massas, *supra*, pág. 850.

Finalmente, al evaluar la procedencia de una sentencia sumaria, los tribunales revisores nos encontramos en la misma posición que el Tribunal de Primera Instancia. Rivera Matos et al. v. Triple-S et al., *supra*, pág. 1025; Meléndez González et al. v. M. Cuebas, *supra*, pág. 115.

De encontrar que los hechos materiales realmente están incontrovertidos, nos corresponde entonces revisar de *novo* si el foro primario aplicó correctamente el Derecho. Rivera Matos et al. v. Triple-S et al., *supra*, pág. 1025; Meléndez González et al. v. M. Cuebas, *supra*, págs. 118-119. Por tanto, "**si el juez se convence de que no existe una posibilidad razonable de que escuchar lo que lee no podrá conducirlo a una decisión a favor de esa parte, debe dictar sentencia sumaria**". (Cita depurada y énfasis suplido).[31] Ramos Pérez v. Univisión, *supra*, pág. 214.

### B. La Ley Federal de Arbitraje

La Ley Federal de Arbitraje (FAA, por sus siglas en inglés), 9 USCA sec. 1 *et seq.*, es un estatuto federal que obliga a los tribunales a darle validez a una cláusula de arbitraje en un contrato según sus términos. Véase 9 USCA sec. 2. Mediante su aprobación, "**el Congreso se aseguró que las cláusulas de arbitraje fueran evaluadas y validadas como cualquier otra cláusula contractual, teniendo en cuenta la autonomía contractual de las partes, e instituyendo así una vigorosa política pública nacional a favor del arbitraje**". (Énfasis suplido). Medina v. Cruz Azul de P.R., 155 DPR 735, 742 (2001) (haciendo referencia a Circuit City Stores, Inc. v. Adams, 532 US 105 (2001)).

---

[31] El concepto "cita depurada" se utiliza para simplificar las citas de fuentes legales y eliminar la explicación innecesaria de alteraciones tipográficas que no son sustantivas. Para referencia, véase J. Metzler, *Cleaning up quotations*, 18 J. App. Prac. & Process, Vol. 143 (2017).

Su propósito principal fue "eliminar la hostilidad del Derecho Común hacia los compromisos contractuales de arbitraje y sustituir en los tribunales federales una política pública que otorgaría a los contratos arbitrales el mismo trato de obligatoriedad que es aplicable a todos los contratos". D. Helfeld, *La jurisprudencia creadora: Factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico*, 70 Rev. Jur. UPR 1, 27 (2001). De ese modo, **la Sección 2 de la FAA dispone que las cláusulas en un acuerdo de arbitraje serán válidas, irrevocables y obligatorias, salvo por los fundamentos que existieran en derecho o en equidad para la revocación de cualquier contrato.**[32]

En cuanto a su aplicación, el Tribunal Supremo de Estados Unidos resolvió que la FAA aplica tanto en los tribunales federales como en los estatales. Southland Corp. v. Keating, 465 US 1, 11 (1984). Véanse, además: Medina v. Cruz Azul de P.R., *supra*, pág. 742; World Films, Inc. v. Paramount Pict. Corp., 125 DPR 352, 358 (1990). Así, Southland Corp. v. Keating, *supra*, representó la culminación de una trayectoria jurisprudencial para

---

[32] La Sección 2 de la Ley Federal de Arbitraje, 9 USCA sec. 2, dispone lo siguiente:

> **A written provision in** any maritime transaction or **a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction,** or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, **shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.** (Énfasis suplido).

asegurar que los propósitos de la FAA fueran implementados en todos los tribunales. Véase D. Helfeld, *op. cit.*, pág. 34.

Según señalamos en World Films, Inc. v. Paramount Pict. Corp., *supra*, pág. 360, "el Tribunal federal culminó una serie de decisiones a favor del arbitraje, resolviendo que incluso serían objeto de arbitraje las reclamaciones fundadas en derechos estatutarios de así haberlo pactado las partes". En ese sentido, en el precitado caso destacamos que el Tribunal Supremo de Estados Unidos expresó lo siguiente: **"By agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to the resolution in an arbitral, rather than a judicial, forum."** (Énfasis suplido). Íd. (citando a Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 US 614, 628 (1985)).

De otro lado, la Corte Suprema federal ha validado el uso de cláusulas para establecer el arbitraje compulsorio de reclamaciones estatutarias en el ámbito laboral. Véase Gilmer v. Interstate/Johnson Lane Corp., 500 US 20 (1991). Así pues, el Máximo Foro federal ha expresado que la mera inequidad en el poder de negociación no es razón suficiente para resolver que los acuerdos de arbitraje nunca podrán ser exigibles en el contexto laboral. Íd., pág. 33.

Posteriormente, el Tribunal Supremo federal examinó el texto de la Sección 1 que excluye a ciertos contratos de

empleo de la cobertura de la FAA.**33**  Véase Circuit City Stores, Inc. v. Adams, *supra*, págs. 114-115.  En ese caso, la Corte Suprema federal resolvió que la FAA podía ser aplicable a todo contrato de empleo, con excepción de aquellos relacionados al trabajo en la industria de la transportación.  Íd.

Hemos señalado que las disposiciones de la FAA se activan cuando las partes alegan y prueban que la transacción implicada en la controversia formó parte del comercio interestatal.  S.L.G. Méndez-Acevedo v. Nieves Rivera, 179 DPR 359, 371 (2010) (haciendo referencia a Medina v. Cruz Azul de P.R., *supra*, pág. 742; Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 US 265, 273-274 (1995); Perry v. Thomas, 482 US 483, 490 (1987)).  Así, hemos expresado que "**según esas circunstancias, como regla general, el campo estará ocupado por la [FAA]**".  (Énfasis suplido).  S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 371.

───────────────

**33**  La Sección 1 de la Ley Federal de Arbitraje, 9 USCA sec. 1, dispone lo siguiente:

"Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but **nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.**  (Énfasis suplido).

De esta forma, una consecuencia fundamental de la aplicación de la FAA es el desplazamiento de cualquier reglamentación estatal que discrimine de su faz en contra del arbitraje. Véase Kindred Nursing Centers Ltd. Partn. v. Clark, 137 S. Ct. 1421, 1426 (2017). En ese sentido, los acuerdos de arbitraje prevalecerán contra aquellas defensas que representen un obstáculo para el cumplimiento de los objetivos de la FAA. Véase AT&T Mobility LLC v. Concepcion, 563 US 333, 343 (2011). En tales casos, la ley estatal debe ceder en virtud de la Cláusula de Supremacía.[34] Véase Perry v. Thomas, *supra*, pág. 491.

La FAA establece una política pública federal a favor del arbitraje. PaineWebber, Inc. v. Soc. de Gananciales, 151 DPR 307, 311 (2000). Véase, además, World Films, Inc. v. Paramount Pict. Corp., *supra*, pág. 357 (haciendo referencia a Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 US 1, 24 (1983)). Asimismo, hemos expresado que en Puerto Rico existe una vigorosa política pública a favor del arbitraje como método alterno para la solución de disputas y toda duda sobre si procede o no el arbitraje debe resolverse a favor de éste conforme ha sido pactado. Constructora Estelar v. Aut. Edif. Púb., 183 DPR 1, 30 (2011); S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 368; PaineWebber, Inc. v. Soc. de Gananciales, *supra*, pág. 312.

---

[34] Art. VI, Cl. 2, Const. EE.UU., LPRA, Tomo 1.

Ahora bien, aun cuando en nuestro ordenamiento existe una fuerte política pública a favor del arbitraje, **este mecanismo se utilizará sólo si las partes así lo han pactado y en la forma en que lo hayan pactado**. S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 368; Crufon Const. v. Aut. Edif. Púbs., 156 DPR 197, 205 (2002). Véase, además, Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 US 468, 478 (1989). Lo anterior es cónsono con el principio reiterado de que el arbitraje es una figura jurídica inherentemente contractual. S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 367.

Dado que el arbitraje es una figura de naturaleza contractual, no se puede obligar a una parte a someter una disputa al procedimiento de arbitraje si esa parte no lo ha pactado de esa forma. S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 368; Crufon Const. v. Aut. Edif. Púbs., *supra*, pág. 205. Así, este Tribunal ha expresado que "**la determinación de si un acuerdo crea el deber de arbitrar una controversia en particular entre las partes es tarea judicial**". (Énfasis suplido). S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 367 (citando a World Films, Inc. v. Paramount Pictures Corp., *supra*, pág. 361).

Sobre lo anterior, hemos determinado que tal controversia incluye tres (3) modalidades, a saber: **(i) si existe un convenio de arbitraje**; (ii) si tal convenio alcanza determinada controversia, y (iii) si tal convenio

alcanza una disputa sobre la duración o expiración del contrato. S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 368. Así pues, si se cuestiona directamente la validez de un acuerdo arbitral le corresponde a los tribunales dilucidarlo. Íd., págs. 374-376; Buckeye Check Cashing, Inc. v. Cardegna, 546 US 440, 445-446 (2006).

El Tribunal Supremo de Estados Unidos ha resuelto que los tribunales sólo pueden invalidar un acuerdo de arbitraje bajo las mismas defensas que son aplicables a todo contrato. Doctor's Assocs., Inc. v. Casarotto, 517 US 681, 687 (1996); Allied-Bruce Terminix Companies, Inc. v. Dobson, *supra*, pág. 281. Por tanto, **para determinar la existencia de un acuerdo de arbitraje válido al amparo de la FAA los tribunales deben acudir a las normas del derecho contractual del estado.** Perry v. Thomas, *supra*, pág. 492 esc. 9.

En ese contexto, el Primer Circuito del Tribunal de Apelaciones de Estados Unidos ha interpretado que la continuación en el empleo es una forma válida de consentir implícitamente a un acuerdo de arbitraje sujeto a la FAA. Véanse: Rivera-Colon v. AT&T Mobility Puerto Rico, Inc., 913 F.3d 200 (1er Cir. 2019); Soto v. State Indus. Prod., Inc., 642 F.3d 67 (1er Cir. 2011). En casos similares, otros tribunales también han sido consecuentes en validar esta forma de consentir.[35] De otra parte, el Tribunal

---

[35] Para referencia, véanse: Keller v. Pfizer, Inc., 2018 WL 5841865 (M.D. Pa., 2018); Nascimento v. Anheuser-Busch Companies, LLC, 2016 WL 4472955 (D. N.J., 2016); Davis v. Nordstrom, Inc., 755 F.3d 1089 (9no

Supremo federal expresó que la FAA requiere que los tribunales hagan cumplir los acuerdos de arbitraje según sus términos, incluyendo a los que proveen procedimientos individualizados. Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1619 (2018).

Luego de establecer la existencia de un acuerdo de arbitraje válido y exigible, "lo prudencial es la abstención judicial, aunque esa intervención no esté vedada". S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 368; Municipio Mayagüez v. Lebrón, 167 DPR 713, 721 (2006). De ese modo, **"una vez acordado el arbitraje, los tribunales carecen de discreción respecto a su eficacia y tienen que dar cumplimiento al arbitraje acordado".** (Énfasis nuestro). S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 368.

### C. La teoría general contractual

El contrato como fuente de la obligación "existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". Art. 1206 del Código Civil, 31 LPRA ant. sec. 3371. Así pues, para que un contrato sea válido debe contener el consentimiento por parte de los contratantes, así como un objeto cierto que sea materia del contrato y

---

Cir. 2014); Corbin v. Affiliated Computer Services, Inc., 2013 WL 3804862 (M.D. Fla., 2013); Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359 (11mo Cir. 2005); Dantz v. Am. Apple Group, LLC., 123 Fed. Appx. 702 (6to Cir. 2005) (no publicado); Toma v. Ernst & Young, LLP, 2005 WL 8145778 (D. N.J., 2005); Hightower v. GMRI, Inc., 272 F.3d 239 (4to Cir. 2001); Bauer v. Pottsville Area Emergency Med. Servs., Inc., 2000 PA Super 252, 758 A.2d 1265 (2000); Wilson v. Darden Restaurants, Inc., 2000 WL 150872 (E.D. Pa., 2000); Howard v. Oakwood Homes Corp., 134 N.C. App. 116 (N.C. App., 1999); Lepera v. ITT Corp., 1997 WL 535165 (E.D. Pa., 1997).

la causa de la obligación que se establezca.[36]   Art. 1213

del Código Civil, 31 LPRA ant. sec. 3391.

Los contratos se perfeccionan por el mero consentimiento

y desde ese momento cada una de las partes está obligada a

cumplir con lo expresamente pactado y las consecuencias que,

según su naturaleza, sean conformes a la buena fe, al uso y

a la ley.   Art. 1210 del Código Civil, 31 LPRA ant. sec.

3375.

El tratadista José Ramón Vélez Torres nos dice que "la

materia relativa al consentimiento comprende dos aspectos

fundamentales y bien diferenciados, que son el relativo a

la capacidad para prestar el consentimiento y el que se

refiere a la prestación del consentimiento".   J.R. Vélez

Torres, *Curso de derecho civil, Derecho de contratos*, Puerto

Rico, Ed. Revista Jurídica de la Universidad de Puerto Rico,

1990, T. IV, Vol. II, pág. 20.   En lo pertinente a la

controversia que nos atañe, evaluaremos el aspecto de la

prestación del consentimiento.

Según exponen los comentaristas, "el consentimiento es

uno de los elementos esenciales del contrato".[37]   M. E.

---

[36]   Resulta meritorio destacar que el elemento en controversia en el presente caso es el consentimiento.

[37]   Según nos comenta la profesora Margarita E. García Cárdenas, "[m]ucha tinta ha corrido en la discusión, en el tema del consentimiento, si ha de prevalecer la teoría volitiva también denominada subjetiva o la declaracionista u objetiva.   En la teoría volitiva o subjetiva del consentimiento, lo esencial es la intención verdadera de la parte contratante con autonomía de si sus expresiones fueron hechas de forma correcta para revelar dicha intención.   Por el contrario[,] en la teoría declaracionista u objetiva lo esencial es la comunicación realizada por la parte contratante.   El gran talón de Aquiles de la teoría volitiva es la inestabilidad que habría de fomentar.   Si se acepta esta visión del consentimiento la otra parte contratante, no sabría, a pesar de haber recibido una aceptación a su oferta o una oferta, cualquiera que sea el caso, si puede confiar en dichas expresiones.   Además de lo cual,

García Cárdenas, *Derecho de obligaciones y contratos*, Puerto Rico, MJ Editores, 2012, pág. 365. El consentimiento es manifestado por el concurso de la oferta y la aceptación sobre la cosa y la causa que han de constituir el contrato. Art. 1214 del Código Civil, 31 LPRA ant. sec. 3401. Así pues, según expone el tratadista Vélez Torres, la declaración o manifestación del consentimiento podría ser en forma expresa o tácita. Vélez Torres, *op. cit.*, pág. 44.

A tono con lo anterior, este Tribunal ha reconocido que "**[e]l consentimiento tácito no es un concepto ajeno a nuestro ordenamiento**". (Énfasis suplido). Teachers Annuity v. Soc. de Gananciales, 115 DPR 277, 289 (1984). En ese contexto, hemos expresado que "**el elemento determinante del consentimiento tácito es la conducta de la persona y no las palabras que utilice para expresarlo**". (Énfasis suplido). Íd., pág. 290. Así, "**[l]os hechos deben revelar inequívocamente la voluntad de consentir**". (Énfasis suplido). Íd.

Ciertamente, "**la teoría contractual se funda sobre la base de la autonomía de la voluntad y la libertad que**

---

¿[c]ómo se prueba qu[é] es lo que la persona quería decir? Para Castán: 'hoy la polémica está acallada y predomina una posición intermedia, cuyo pensamiento capital es que, si bien de ordinario ha de prevalecer la voluntad efectiva de las partes, no se atiende, sin embargo, a la divergencia interna, y debe prevalecer la voluntad declarada, cuando lo exigen así la buena fe y la seguridad de[l] comercio jurídico'. **Son los actos exteriores de las personas lo que permite interpretar su sentir. En Puerto Rico para el consentimiento en los contratos rige la teoría declaracionista u objetiva.**" (Énfasis suplido y cita omitida). M. E. García Cárdenas, *Derecho de obligaciones y contratos*, Puerto Rico, MJ Editores, 2012, pág. 383.

**tienen las partes contratantes de establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público**". (Cita depurada). BPPR v. Sucn. Talavera, 174 DPR 686, 693 (2008). Véanse, además: Jarra Corp. v. Axxis Corp., 155 DPR 764, 772 (2001); Trinidad v. Chade, 153 DPR 280, 289 (2001).

Cónsono con nuestro ordenamiento, si los términos del contrato son claros, se hará valer el sentido literal de lo allí dispuesto. Savary et al. v. Mun. Fajardo et al., *supra*, pág. 1030. En consecuencia, los tribunales no deben recurrir a las reglas de interpretación y hermenéutica cuando la intención de los contratantes y los términos pactados son claros. Véase Art. 1233 del Código Civil, 31 LPRA ant. sec. 3471.

De otra parte, el hecho de que el contrato de empleo sea uno típico de adhesión, no significa que esté viciado de nulidad. Arthur Young & Co. v. Vega III, 136 DPR 157, 166 esc. 9 (1994); C.R.U.V. v. Peña Ubiles, 95 DPR 311, 314 (1967); Casanova v. P.R.-Amer. Ins. Co., 106 DPR 689, 697 (1978). Así pues, sólo cuando el contrato de adhesión contiene cláusulas ambiguas es que se activa la norma de interpretación contra la parte que lo redactó. Véase Arthur Young & Co. v. Vega III, *supra*, pág. 166 esc. 9.

De igual forma, hemos reconocido que "[l]a buena fe es un principio medular en nuestro derecho de contratos". Oriental Financial v. Nieves, 172 DPR 462, 471 (2007).

Este principio "exige no defraudar la confianza que el otro ha puesto en una promesa o conducta". Constructora Estelar v. Aut. Edif. Púb., *supra*, pág. 41.

Por otra parte, **"el contenido de la norma de que a nadie es lícito ir contra los actos propios tiene fundamento y raíz en el principio general de Derecho que ordena proceder de buena fe en la vida jurídica"**. (Cita depurada y énfasis suplido). Alonso Piñero v. UNDARE, Inc., 199 DPR 32, 55 (2017). La eficacia de la doctrina y su fuerza vinculante tienen el efecto de proteger la confianza depositada en la apariencia, que es por extensión la protección de un interés social o la consecución de un ideal de justicia. Íd. Por ende, **"la conducta contradictoria no tiene lugar en el campo del Derecho, y debe ser impedida"**. (Cita depurada y énfasis suplido). Íd.

### III. Análisis

Contrario a lo determinado por el Tribunal de Apelaciones, consideramos que en el presente caso no existen hechos materiales en controversia. Luego de un análisis riguroso de los escritos presentados y los documentos que obran en autos, nos encontramos en posición de determinar si los recurridos consintieron al acuerdo de arbitraje.[38] Por lo tanto, simplemente nos resta aplicar el derecho conforme al marco jurídico expuesto.

---

[38] Por estar entrelazados, discutiremos los señalamientos de error en conjunto.

Hemos expresado que la FAA es aplicable en los tribunales estatales. Los recurridos alegaron que la controversia planteada en este caso debe resolverse al amparo de la Ley de Arbitraje de Puerto Rico, 32 LPRA 3201 *et seq*. Sin embargo, el acuerdo de arbitraje en cuestión dispone que el mismo se regirá e interpretará conforme a la FAA.[39] En ese sentido, los recurridos no presentaron alegaciones específicas que refuten la aplicación del estatuto federal, por lo que estamos ante un acuerdo de arbitraje gobernado por la FAA.

La controversia central del presente recurso se circunscribe a determinar si existe un acuerdo de arbitraje válido. Según el derecho esbozado, la solución de esta controversia en particular es tarea judicial. Para ello, evaluaremos si era necesaria -para su eficacia- la firma de las partes en el acuerdo de arbitraje o si, por el contrario, bastaba la continuidad de los recurridos en el empleo. En ese contexto, atenderemos los planteamientos de los recurridos en cuanto a la validez de su consentimiento. Veamos.

De un análisis exhaustivo del texto de la FAA, surge que el estatuto federal sólo requiere que el acuerdo de arbitraje conste por escrito. Por otro lado, aclaramos que el uso de un medio electrónico para plasmar el acuerdo

---

[39] El inciso 6(f) del Acuerdo de Arbitraje que nos atañe dispone lo siguiente:

El presente Acuerdo se regirá e interpretará conforme con la FAA. El negocio de la Compañía y su empleo en la misma suponen el comercio interestatal. Véase Apéndice del *Certiorari*, pág. 57.

de arbitraje satisface este requisito.[40] **Ahora bien, aun cuando el acuerdo de arbitraje debe constar por escrito, la FAA no requiere la firma de las partes en el convenio para su validez.**

Tampoco podemos concluir, como nos solicitan los recurridos, que la firma de las partes era indispensable a la luz de los términos del acuerdo de arbitraje en controversia. Tal requisito no surge del Acuerdo. De hecho, según señaláramos, de conformidad con el Acuerdo, la forma exigida para su aceptación era la continuidad de los recurridos en el empleo sesenta (60) días después de haber sido notificados sobre sus términos. Por lo tanto, la aprobación escrita de las partes no era un requisito indispensable para convertir el Acuerdo en uno vinculante. **En vista de ello, concluimos que ni la FAA ni el contrato requerían la firma de las partes para su validez.**

Pasemos entonces a evaluar si la permanencia en el empleo constituyó un consentimiento eficaz. Para ello acudiremos a los principios generales de la teoría contractual en Puerto Rico. Asimismo, por su pertinencia y

---

**40** La Ley de firmas electrónicas en el comercio mundial y nacional, 15 USCA sec. 7001, dispone lo siguiente:

Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II), **with respect to any transaction in or affecting interstate or foreign commerce—**

(1) **a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form;** and

(2) a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation. (Énfasis suplido).

persuasividad, consideraremos el hecho de que el Primer Circuito del Tribunal de Apelaciones de Estados Unidos y otros tribunales han interpretado que la continuación en el empleo es una forma válida de consentir implícitamente a un acuerdo de arbitraje sujeto a la FAA. Veamos, pues, si se perfeccionó un acuerdo de arbitraje a la luz de los hechos incontrovertidos y el derecho aplicable.

La teoría de los contratos se funda sobre la base de la autonomía de la voluntad y la libertad que tienen las partes contratantes de establecer los pactos, cláusulas y condiciones que tengan por conveniente. Por otra parte, es conocido que el consentimiento tácito no es un concepto ajeno a nuestro ordenamiento. En ese sentido, hemos expresado que los hechos deben revelar inequívocamente la voluntad de consentir.

Ciertamente, los recurridos fueron notificados sobre los términos del Acuerdo al correo electrónico que les fue provisto por la empresa para fines de su empleo, en al menos tres (3) ocasiones distintas. Cabe señalar que éstos se encontraban familiarizados con el uso de los medios electrónicos para recibir la información y los documentos relacionados a su empleo. Además, Pfizer les notificó a los recurridos que podían consultar el Acuerdo con un abogado y les concedió tiempo para evaluar el mismo.

Así pues, no está en controversia que los recurridos fueron debidamente informados de que su continuidad en el

empleo por más de sesenta (60) días constituiría su consentimiento al programa de arbitraje compulsorio en la empresa. La alegación de que algunos recurridos no recuerdan haber recibido la información nos parece insuficiente. Sin duda alguna, tuvieron amplia oportunidad de conocer sobre los términos con un mínimo de diligencia. Ante este cuadro, los recurridos continuaron trabajando para la empresa transcurrido el término de sesenta (60) días establecido en el Acuerdo.

Evidentemente, la actuación de los recurridos representó una declaración implícita de su voluntad con relación al acuerdo de arbitraje y el mismo quedó perfeccionado. Al así actuar, los recurridos prestaron su consentimiento en la forma dispuesta en el Acuerdo para su validez.

**De este modo, el elemento determinante del consentimiento en el presente caso fue la conducta de los recurridos al permanecer en el empleo transcurridos los sesenta (60) días después de ser notificados sobre los términos del Acuerdo. Como hemos señalado, la conducta contradictoria a los actos propios no tiene lugar en nuestro ordenamiento y debe impedirse, por lo que los recurridos están impedidos de ir contra sus propios actos. Así lo exigen la buena fe y la seguridad del comercio jurídico.**

Finalmente, el hecho de que un acuerdo sea considerado como un contrato de adhesión no significa que esté viciado

de nulidad. La FAA requiere que tanto los tribunales federales como los estatales hagan cumplir los acuerdos de arbitraje como cualquier otro contrato. Cónsono con lo anterior, los acuerdos de arbitraje sólo pueden ser invalidados bajo las mismas defensas que son aplicables a todo contrato. Por tanto, cuando los términos de un acuerdo son claros y no dan margen a ambigüedades o diferentes interpretaciones, los tribunales deben hacerlos valer en el sentido de lo allí dispuesto.

El acuerdo de arbitraje en el caso de autos expresa de manera clara la obligación que tienen las partes de someter sus reclamaciones a un proceso de arbitraje individualizado. Por consiguiente, en ausencia de ambigüedad en los términos del acuerdo de arbitraje, resulta improcedente aplicar una interpretación a los fines de favorecer a la parte que no intervino en su redacción.

Es menester destacar que los recurridos no fueron privados de sus reclamos en virtud del acuerdo de arbitraje. El único efecto del Acuerdo fue sustituir el foro judicial por uno arbitral para la resolución de las reclamaciones cubiertas. Las reclamaciones estatutarias en el caso de autos fueron sometidas al proceso de arbitraje. Así pues, los recurridos conservaron sus derechos sustantivos y podrán presentar sus respectivos reclamos ante el foro arbitral.

En conclusión, conforme a la teoría contractual de Puerto Rico y la fuerte política pública a favor del arbitraje que establece la FAA, determinamos que erró el Tribunal de Apelaciones al revocar la *Sentencia* del Tribunal de Primera Instancia y no poner en vigor un acuerdo de arbitraje válido.  Por consiguiente, determinamos que en este caso existe un acuerdo de arbitraje exigible entre Pfizer y los recurridos, por lo que carecemos de discreción respecto a su eficacia y tenemos que dar cumplimiento al mismo según sus términos.

## IV.  Conclusión

Por los fundamentos expuestos, revocamos la *Sentencia* del Tribunal de Apelaciones y reinstalamos el dictamen emitido por el Tribunal de Primera Instancia mediante el cual se desestimó la *Querella* de los recurridos.

Se dictará Sentencia de conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Enrique Aponte Valentín; Ángel Arroyo Arocho; José L. Candelario Lozada; Juan O. Clavell Santiago; Juan A. Feliciano Esperanza; Hugo O. Fernández Collazo; Félix L. Figueroa Rodríguez; Arturo Flores Aguayo; Wilfredo Fuentes Félix; Ernesto González Maldonado; Javier A. Maldonado Pérez; Luis A. Manatou Hernández; Carlos A. Meléndez Cosme; Roberto Ortega Hernández; Jorge L. Pagán Ginés; Héctor Parés Santiago; José A. Pérez Moyeno; Manuel Pérez Santos; Efraín A. Pérez Vélez; Armando Rivera García; Ángel L. Rodríguez Rivera; Héctor M. Vázquez Ortiz; Ángel L. Vázquez Rodríguez; Pedro L. Vega Tirado; Maxie Vélez Burgos<br><br>Recurridos<br><br>v.<br><br>Pfizer Pharmaceuticals, LLC<br><br>Peticionaria | CC-2018-748 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 10 de noviembre de 2021.

Por los fundamentos expuestos en la *Opinión* que antecede, la cual se hace formar parte íntegra de la presente *Sentencia*, se revoca la *Sentencia* del Tribunal de Apelaciones notificada el 23 de julio de 2018 y se reinstala la *Sentencia* del Tribunal de Primera Instancia notificada el 18 de mayo de 2018 mediante la cual se desestima la *Querella* de los recurridos.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez disiente con Opinión escrita, a la cual se une el Juez Asociado señor Colón Pérez. La Jueza Presidenta Oronoz Rodríguez disiente y hace constar la expresión siguiente:

"Discrepo del proceder de la Mayoría, pues valida una actuación injusta e irrazonable de un patrono. Surge del expediente que Pfizer alteró unilateral y retroactivamente las condiciones de una **relación laboral preexistente** al imponerle a sus empleados un acuerdo de arbitraje compulsorio. Uno de los términos de dicho acuerdo era que, para continuar en su trabajo, los empleados debían consentir al mismo. En otras palabras, se les impuso como condición para retener su empleo aceptar el acuerdo de arbitraje, de lo contrario, debían renunciar. Esto, sin más, supone un problema de voluntariedad, toda vez que existe la posibilidad de que el empleado se vea obligado a aceptar el acuerdo de arbitraje meramente para conservar su empleo. Aquí no cabe hablar de que hubo un pacto de arbitraje voluntario. Hoy, la Mayoría le adscribe a los patronos una facultad que ubica a la clase trabajadora del País en una posición de evidente desventaja.

Un pacto de arbitraje voluntario es el que brinda a los empleados y empleadas la opción de no suscribirlo, sin que ello conlleve la consecuencia drástica e ineludible de perder su empleo. Solo así, quedaría salvaguardada la voluntad real de los obreros, pues podrían tomar una decisión libre del vejamen que supondría prescindir de su sustento económico. Ciertamente, ese no es el escenario que tenemos aquí. El arbitraje en cuestión choca de manera irremediable con aquel que las partes **voluntariamente acuerdan** para someter sus controversias a un tercero neutral que tiene la facultad de rendir una determinación. Véase Aquino González v. A.E.E.L.A., 182 DPR 1, 20 (2011); D.M. Helfeld, *La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico*, 70 (Núm. 1) Rev. Jur. U.P.R. 1, *5* (2001).

Ahora bien, debe quedar claro que mantengo mi posición que un acuerdo de arbitraje —comercial u obrero-patronal— pactado válidamente, se debe hacer valer, pues es un método alterno de

adjudicación, distinto al trámite judicial, que resulta en una solución más rápida y económica a las controversias litigiosas. Constructora Estelar y. Aut. Edif. Pub., 183 DPR 1, 30 (2011). Al confrontarnos con un pacto de arbitraje convenido voluntariamente y conforme a derecho, debemos considerarlo exigible, cónsono con la política pública a favor del arbitraje existente en nuestra jurisdicción. Vivoni Farage v. Ortiz Carro, 179 D.P.R. 990, 1000-1001, 1006 (2010); S.L.G. Méndez-Acevedo v. Nieves Rivera, 179 D.P.R. 359, 368 (2010)".

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Enrique Aponte Valentín; Ángel Arroyo Arocho; José L. Candelario Lozada; Juan O. Clavell Santiago; Juan A. Feliciano Esperanza; Hugo O. Fernández Collazo; Félix L. Figueroa Rodríguez; Arturo Flores Aguayo; Wilfredo Fuentes Félix; Ernesto González Maldonado; Javier A. Maldonado Pérez; Luis A. Manatou Hernández; Carlos A. Meléndez Cosme; Roberto Ortega Hernández; Jorge L. Pagán Ginés; Héctor Parés Santiago; José A. Pérez Moyeno; Manuel Pérez Santos; Efraín A. Pérez Vélez; Armando Rivera García; Ángel L. Rodríguez Rivera; Héctor M. Vázquez Ortiz; Ángel L. Vázquez Rodríguez; Pedro L. Vega Tirado; Maxie Vélez Burgos<br><br>Recurridos<br><br>v.<br><br>Pfizer Pharmaceuticals, LLC<br><br>Peticionaria | CC-2018-748 | <u>Certiorari</u> |

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ, a la cual se une el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 10 de noviembre de 2021.

Hoy, una mayoría de este Tribunal legitima jurídicamente la práctica en la que un patrono impone unilateralmente a un empleado una cláusula de arbitraje, cuyo principal efecto es su renuncia involuntaria a las garantías que nuestro ordenamiento jurídico le reconoce.

Para ello se recurre forzadamente a la teoría del consentimiento tácito y se concluye que la continuidad en el empleo constituye una forma válida de consentir a un procedimiento de arbitraje. De esta forma, se establece un precedente que valida y aumenta desmedidamente el poder de los patronos para variar a su propia y única prerrogativa los términos de un contrato laboral y que reduce los derechos laborales de los empleados. Ello, de espaldas a la incontrovertible política pública e interés del Estado en salvaguardar hasta el máximo posible los derechos sustantivos y procesales de los empleados frente a su patrono.

Por entender que el tracto fáctico de esta controversia revela que el alegado acuerdo de arbitraje adolece del requisito de voluntariedad y, más relevante aún, que esta práctica es contraria a la política pública laboral vigente, que desafortunadamente se está ignorando y desmantelando, disiento del curso de acción seguido por una mayoría de este Tribunal. Por tanto, procedo a explicar y hacer constar los fundamentos que hacen imperativo disentir.

## I

El Sr. Enrique Aponte Valentín y otros veinticuatro (24) obreros (empleados o recurridos) fueron contratados por Pfizer Pharmaceuticals, LLC (Pfizer) bajo un contrato individual de empleo con vigencia indefinida. Por lo anterior, en caso de surgir una disputa laboral, las partes podían acudir al foro judicial a dirimir sus controversias.

No obstante, posteriormente, Pfizer **unilateralmente** cambió los términos contractuales que regían la relación laboral con sus empleados. Esto, luego de que, a través de una serie de correos electrónicos, les notificara que había adoptado un programa de arbitraje compulsorio de conformidad con la Ley Federal de Arbitraje, infra.[1] Mediante tal programa, los empleados debían renunciar a su derecho a instar una acción laboral colectiva y a ventilar sus disputas laborales ante los foros judiciales para sustituirlo por el arbitraje. **Como agravante, éstos tendrían que asumir parte de los gastos iniciales del procedimiento y pagar por su representación legal.**

Pfizer le indicó a los empleados que la aceptación del acuerdo de arbitraje era **una condición necesaria para continuar su empleo en la empresa.** A esos fines, incluyó la cláusula siguiente:

> [N]o se requiere de su reconocimiento con respecto al presente Acuerdo con la finalidad de implementar el Acuerdo. Si comienza a trabajar o **continúa trabajando para la Compañía sesenta (60) días después de recibir el presente Acuerdo, inclusive sin brindar su reconocimiento del mismo, el presente Acuerdo entrará en vigencia y se considerará que brindó su consentimiento, ratificó y aceptó el presente Acuerdo** mediante su aceptación del empleo y/o la continuación de empleo con la misma.[2] (Énfasis suplido).

---

[1] Apéndice de certiorari, Acuerdo de arbitraje mutuo y renuncia a demanda de clase, págs. 52-57.

[2] Íd., pág. 57.

Según se desprende del expediente, todos los empleados continuaron laborando en Pfizer luego de la imposición unilateral y retroactiva de esta cláusula.

Posteriormente, Pfizer trasladó a los empleados a otra compañía. Bajo la creencia de que se trataba de un despido injustificado, éstos presentaron colectivamente una acción judicial y solicitaron que su reclamación se tramitara conforme a la Ley de procedimiento sumario de reclamaciones laborales, infra.

Ante ello, Pfizer solicitó la desestimación sumaria de la querella por falta de jurisdicción. Fundamentó su petición en la vigencia del acuerdo de arbitraje mandatorio para dirimir disputas laborales. Alegó que éste era un acuerdo válido porque los empleados prestaron su consentimiento tácitamente.

Por su parte, los empleados replicaron que nunca firmaron dicho acuerdo y que éste no formó parte de su contrato laboral inicial. De esta forma, cuestionaron el poder de Pfizer para variar tal contrato unilateralmente, condicionando así su permanencia al reconocimiento del programa de arbitraje impuesto retroactivamente.

Al evaluar la controversia, el Tribunal de Primera Instancia desestimó de forma sumaria la querella por entender que, como consecuencia de la referida cláusula de arbitraje, no tenía jurisdicción. Fundamentó su determinación en que la permanencia de los empleados en su

empleo evidenciaba su consentimiento tácito con el programa de arbitraje de Pfizer.

Insatisfechos, los empleados presentaron un recurso de apelación ante el Tribunal de Apelaciones. Allí, plantearon que nunca consintieron ni suscribieron el alegado convenio de arbitraje por lo que éste no les era oponible. Por tanto, solicitaron que se declarara nula la obligación de arbitrar y, en su lugar, se reafirmara la jurisdicción del tribunal sobre la disputa laboral.

Ante ello, el Tribunal de Apelaciones revocó la sentencia tras concluir que le correspondía al foro primario dilucidar la controversia en torno a la voluntariedad del acuerdo de arbitraje y el alegado consentimiento de los empleados. Particularmente, determinó que, en nuestro ordenamiento jurídico, el elemento crucial del consentimiento tácito es la conducta de la persona, la que debe revelar de forma inequívoca la voluntad de consentir. El foro apelativo intermedio alcanzó tal conclusión al contextualizar la controversia dentro del marco normativo laboral vigente. Por tanto, ordenó la devolución del caso al Tribunal de Primera Instancia para la celebración de una vista evidenciaria a esos fines.

En desacuerdo, Pfizer presentó el recurso de certiorari que nos ocupa. Arguyó que el Tribunal de Apelaciones erró al negarse a concluir que un empleado consiente tácitamente a someterse a un procedimiento de arbitraje mediante su continuidad en el empleo posterior a

la vigencia del programa. Añadió que el foro apelativo intermedió también se equivocó al determinar que existían controversias de hecho que impedían la disposición sumaria del pleito de epígrafe.

Trabada así la controversia, una Mayoría de este Tribunal erróneamente resuelve que un empleado acepta tácitamente someterse a un procedimiento de arbitraje con la mera permanencia en su empleo. De esta forma, la Opinión mayoritaria expande irrazonablemente el poder del patrono en la contratación individual laboral y le faculta a obligar a un empleado a renunciar a sus protecciones estatutarias, sin que éstos tengan capacidad real de oponérsele.

Lo anterior, no tan sólo produce un resultado evidentemente injusto, sino que pone en entredicho una de las premisas en las que se ancla el arbitraje: la voluntariedad. Veamos, entonces, los fundamentos de mi disenso.

## II

### A.

Mediante el arbitraje, las partes contratantes voluntariamente acuerdan someter y presentar sus controversias ante un tercero neutral que está investido con la facultad de rendir una decisión. Aquino González v. A.E.E.L.A., 182 DPR 1, 20 (2011); D. Fernández, El arbitraje obrero-patronal, Bogotá, Ed. Forum, 2000, pág. 9. Empero, la sustitución de foros que presume la figura del arbitraje sólo se puede exigir cuando las partes lo hayan acordado.

Íd., pág. 425. En ese sentido, **una de las principales características del arbitraje es que es un acuerdo voluntario entre las partes**. D. Fernández, op cit. pág. 20.

Ciertamente, la Ley Federal de Arbitraje, 9 USCA sec. 1 et seq., establece una política pública federal a favor del arbitraje. PaineWebber, Inc. v. Soc. de Gananciales, 151 DPR 307, 311 (2000). De igual forma, en Puerto Rico el arbitraje constituye un método alterno para la solución de conflictos. Aquino González v. A.E.E.L.A., supra, pág. 26. Esto, como resultado del interés del Estado de facilitar vías más rápidas, flexibles y menos onerosas que los tribunales para la resolución de controversias que surgen de una relación contractual entre las partes. H.R., Inc. v. Vissepó & Diez Constr., 190 DPR 597, 605 (2014).

Sin embargo, hemos sido enfáticos en que, aun cuando favorecemos su uso, este mecanismo sólo procederá cuando las partes así lo hubieran pactado. SLG Méndez-Acevedo v. Nieves Rivera, 179 DPR 359, 368 (2010). Ello, pues, ante todo, el arbitraje es una figura jurídica de naturaleza contractual. Municipio Mayagüez v. Lebrón, 167 DPR 713, 720 (2006).

Por tanto, una de las controversias que las partes tienen el derecho a dirimir ante los tribunales es aquella relacionada a la obligación de arbitrar. SLG Méndez-Acevedo v. Nieves Rivera, supra, pág. 367. En ese menester judicial, los tribunales deben determinar si existe un convenio de arbitraje; si ese convenio cobija determinada controversia,

y si el convenio alcanza una disputa sobre la duración o expiración del contrato. Íd., pág. 368. De modo que, ante un cuestionamiento sobre la validez de un acuerdo arbitral, es tarea judicial determinarlo. Íd., págs. 374-376; Buckeye Check Cashing, Inc. v. Cardegna, 546 US 440, 444-445 (2006).

En cuanto a la controversia sobre si existe un acuerdo de arbitraje entre las partes al amparo de la Ley Federal de Arbitraje, supra, el Máximo Foro federal ha resuelto que los tribunales podrán invalidar un acuerdo de arbitraje bajo las mismas defensas que son aplicables a todo contrato. Véanse, Gaines v. AT&T Mobility Servs., LLC, 424 F. 3d 1004 (2019); Circuit City Stores, Inc. v. Adams, 279 F.3d 889 (2002); Doctor's Assocs., Inc. v. Casarotto, 517 US 681, 687 (1996); Allied – Bruce Terminix Cos. Vv. Dobson, 513 US 265, 281 (1995). En ese sentido, los tribunales están facultados para acudir a las normas del derecho contractual de nuestra jurisdicción para determinar si existe un acuerdo de arbitraje válido al amparo del estatuto federal. Perry v. Thomas, 482 US 483, 490 (1987).

Por consiguiente, para resolver si en el caso de epígrafe existe un convenio de arbitraje entre Pfizer y los empleados, debemos acudir a las doctrinas y los principios fundacionales de nuestro derecho contractual junto a las normas de hermenéutica de derecho laboral que imperan en nuestra jurisdicción.

**B.**

Como es conocido, un contrato se perfecciona mediante la concurrencia de los elementos de la causa, el objeto y el consentimiento. 31 LPRA ant. sec. 3391. Este último se manifiesta por el concurso de la oferta, la aceptación sobre la cosa y la causa que han de constituir el contrato. 31 LPRA ant. secs. 3391, 3401. En relación con el consentimiento, el Profesor José Vélez Torres comenta que **"la prestación del consentimiento para que sea considerada válida, presume una voluntad capaz que sea, además, libre y que tenga completo conocimiento sobre lo que está haciendo; es decir, una voluntad que actúa libre y espontáneamente"**.[3] (Énfasis suplido). J.R. Vélez Torres, <u>Curso de derecho civil: derecho de contratos</u>, San Juan, Facultad de Derecho de la Universidad Interamericana, 1990, T. V, Vol. II, pág. 45.

A su vez, en nuestra jurisdicción rige el principio de la libertad de contratación. 31 LPRA ant. sec. 3371. Sin embargo, como límite a dicha libertad, las partes "pueden establecer los pactos, cláusulas y condiciones que tengan

---

[3] Esta dimensión del consentimiento lo hemos invocado para intervenir en situaciones en donde una o ambas partes han cuestionado su consentimiento a cierto negocio contractual. Véase, a modo persuasivo <u>L.M. Quality Motors v. Motorambar, Inc.</u>, 183 DPR 259 (2011)(Resolución con voto particular disidente emitido por el Juez Asociado Señor Rivera García, al cual se unieron la Jueza Asociada Señora Pabón Charneco, el Juez Asociado Señor Feliberti Cintrón y el Juez Asociado Señor Estrella Martínez); <u>Trinidad v. Chade</u>, 153 DPR 280 (2001), <u>Colón Gutiérrez v. Registrador</u>, 114 DPR 850, 863 (1983).

por conveniente, siempre que no sean contrarios a las leyes, a la moral, **ni al orden público**". (Énfasis suplido). 31 LPRA ant. sec. 3372.

Por tal razón, independientemente del tipo de contrato de que se trate y de la importancia que éste merezca para las partes contratantes, es nulo y, por lo tanto, inexistente, un contrato que resulte contrario a las leyes, a la moral o al orden público. Morales v. Municipio de Toa Baja, 119 DPR 682, 693 (1987). En cuanto al significado e importancia del orden público hemos expresado que:

> [E]s el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. **Este recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger.** En gran medida es un acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero aun sin esa declaración legislativa, **constituyen principios rectores de sabio gobierno, nacidos de la civilización y fortalecidos por la cultura, la costumbre y por la manera de ser; en fin, por el estilo de una sociedad. Tanto en la costumbre como en la ley se manifiesta la voluntad social predominante.** (Énfasis suplido). De Jesús González v. A.C., 148 DPR 255, 264 esc. 5 (1999) (citando a Hernández v. Méndez & Assoc. Dev. Corp., 105 DPR 149, 153-154 (1976)).

En este momento, debo destacar que, en nuestra jurisdicción, el derecho al trabajo y las protecciones que cobijan a los trabajadores son parte de aquellos valores que hemos decidido priorizar como sociedad. Según se expone a continuación, esta voluntad social predominante se

manifiesta a través de los estatutos protectores del empleo. Por tanto, un pacto que sea contrario a estos valores atenta contra el orden público.

## C.

En Puerto Rico, "[l]a piedra angular en el ordenamiento laboral resultante es, sin duda, el derecho al empleo, pues, sin el derecho a retener el empleo, poco sentido tendrían las demás protecciones asociadas al trabajo". Whittenburg v. Col. Ntra. Sra. Del Carmen, 182 DPR 937, 949 (2011). Debido a los diversos y adversos efectos que acarrea la pérdida del empleo, el Estado tiene un interés apremiante en regular las relaciones entre los trabajadores y sus patronos **con el fin de prever y prevenir prácticas injustas.** Díaz v. Wyndham Hotel Corp., 155 DPR 364, 374 (2001). Ello "[e]s así, tanto por lo que significa a nivel individual en la vida diaria de decenas de miles de puertorriqueños y puertorriqueñas, como por el beneficio colectivo que se genera cuando a través del esfuerzo ofrecemos calidad de vida a nuestro pueblo y desarrollo social y económico para nuestro país". Rivera Figueroa v. The Fuller Brush Co., 180 DPR 894, 902 (2011).

Cónsono con esos principios, se ha establecido una fuerte política pública laboral cuyo objetivo es garantizar una protección mayor a los trabajadores. Cordero Jiménez v. UPR, 188 DPR 129, 139 (2013). Estas protecciones estatutarias tienen fuertes raíces constitucionales y cobijan tanto a trabajadores contratados individualmente

como aquellos organizados colectivamente.[4] J. Farinacci Fernós, _Hermenéutica puertorriqueña: Cánones de interpretación judicial_, Puerto Rico, Editorial InterJuris, 2019, pág. 253.

Uno de los pilares de esta política pública es la _Ley de procedimiento sumario de reclamaciones laborales_, Ley Núm. 2 de 17 de octubre de 1961, según enmendada, 32 LPRA sec. 3118 _et seq_. (Ley Núm. 2). Este estatuto tiene como propósito viabilizar que las reclamaciones de obreros y obreras en contra de sus patronos se tramiten sumariamente. _Rivera v. Insular Wire Products Corp._, 140 DPR 912, 921 (1996). Ello responde al gran interés público de que los trabajadores tengan un acceso adecuado al Poder Judicial para vindicar sus derechos. Particularmente, ante la realidad de que éstos se encuentran tradicionalmente en una posición desventajada económicamente ante un patrono.

---

[4]En _Whittenburg v. Col. Ntra. Sra. Del Carmen_, supra, expresamos que:

No hay más que repasar nuestra Constitución para advertir la importancia del derecho al trabajo en nuestra sociedad, reconocimiento que surge del valor social del trabajo como elemento central de la vida en sociedad. **Esta realidad no solo la reconoció la Convención Constituyente sino que ha sido objeto de actuaciones legislativas a través de los años que han resultado en una política pública laboral que claramente protege los derechos de los trabajadores contra el capricho y abuso patronal.** (Énfasis suplido). Íd., pág. 949.

Vizcarrondo Morales v. MVM, Inc., 174 DPR 921, 928-929 (2008).

Por lo anterior, el estatuto provee el beneficio de que la concesión de costas en el proceso tiene que ser de oficio. 32 LPRA sec. 3132. Ésto significa que las alegaciones presentadas bajo el procedimiento sumario laboral no cancelan Sellos de Rentas Internas ni de alguna otra índole. Valentín v. Housing Promoters, Inc., 146 DPR 712, 718 (1998). Además, de dictarse sentencia a favor del querellante, el patrono está obligado a pagar los honorarios de abogado. 32 LPRA sec. 3132. Hernández Maldonado v. Taco Maker, 181 DPR 281, 295 (2011).

Como se puede apreciar, esta legislación es cónsona con el objetivo de garantizar mayor protección a los derechos laborales de los trabajadores. En sintonía con ese objetivo, este Tribunal ha desarrollado una norma específica de interpretación judicial laboral. Ésta es: **la liberalidad a favor del trabajador, resolviéndose toda duda a su favor.** J. Farinacci Fernós, Interpretación Liberal: Presunciones Probatorias En La Legislación Protectora Del Trabajo, 83 Rev. Jur. UPR 15, 22 (2014).

Conforme a dicha hermenéutica jurídica, al abordar una controversia que nos cree dudas en cuanto a la aplicabilidad de una legislación laboral, estamos llamados a interpretar ampliamente la legislación cuando le conviene al trabajador y, restrictivamente, cuando le afecta. Romero et als. v. Cabrer Roig et als., 191 DPR 643, 653 (2014). De igual modo,

hemos establecido que **la exclusión de un empleado de los beneficios de la legislación laboral "debe ser clara y debe interpretarse restrictivamente"**. (Énfasis suplido). <u>López Vega v. F. Vega Otero, Inc.</u>, 103 DPR 175, 177 (1974); <u>López Santos v. Tribunal Superior</u>, 99 DPR 325, 330 (1970). Sólo de esta forma nos aseguramos de que se cumplan los propósitos eminentemente sociales y reparadores de este tipo de legislación. <u>Cardona Caraballo v. ACT</u>, 196 DPR 1004, 1017 (2016). Sobre esta norma de hermenéutica judicial, el Profesor Farinacci Fernós comenta lo siguiente:

> [L]a articulación correcta de este canon es que se interpretarán y construirán las normas laborales liberalmente, resolviendo toda duda, ya sea comunicativa o normativa, en favor del obrero o de la obrera. . . . **[É]ste canon requiere llevar a cabo una aplicación de las normas laborales, de forma que adelanten lo más posible su fin social.** . . . Por tanto, enfrentado a una situación en la que es posible extender la protección legal establecida en una norma laboral, **el tribunal debe resolver esa disyuntiva en favor de la extensión y protección. Esta norma aplica tanto a normas sustantivas de legislación protectora del trabajo, como aquellas de naturaleza procesal, incluyendo las disposiciones de la Ley Núm. 2-1961**. Farinacci Fernós, <u>op cit.</u> pág. 254. (énfasis suplido).

### III

La controversia central del presente recurso estriba en determinar la validez de la imposición retroactiva y unilateral de una cláusula de arbitraje que veda a los empleados de presentar sus reclamaciones laborales ante los

tribunales. Ello, requería auscultar si el convenio de arbitraje fue producto de un acuerdo voluntario entre las partes o si, por el contrario, éste no es exigible por tratarse de una imposición unilateral del patrono a la que los empleados, de facto, no podían oponerse. Contrario a la Mayoría, considero que debimos decantarnos por la segunda premisa. Me explico.

Como vimos, antes de que un contrato se perfeccione debe existir una oferta y una aceptación. A su vez, deben estar presente los requisitos de consentimiento, objeto y causa. Por su parte, el arbitraje es un asunto contractual y una de sus características principales es que se trata de un convenio voluntario. En el caso ante nos, la cláusula de arbitraje aquí en controversia no surgió de un convenio entre las partes, sino de una imposición unilateral y obligatoria de Pfizer a sus empleados.

Ante esa realidad, la Opinión mayoritaria recurre a la teoría del consentimiento tácito para justificar la validez del arbitraje. Para ello, incorrectamente cita con aprobación el caso de Rivera Colón v. AT&T Mobility Puerto Rico, Inc., 913 F.3d 200 (1er Cir. 2019), resuelto por el Primer Circuito del Tribunal de Apelaciones de Estados Unidos. Ciertamente, dicho Tribunal decidió que la continuación en el empleo fue una forma válida de consentir implícitamente a un acuerdo de arbitraje sujeto a la Ley Federal de Arbitraje, supra. Sin embargo, a diferencia del curso de acción seguido por Pfizer, en Rivera Colón v. AT&T

Mobility Puerto Rico, Inc., supra, como parte de la incorporación del acuerdo de arbitraje al contrato laboral, **el patrono le ofreció a la empleada la alternativa de no aceptarlo y preservar su derecho a dirimir las disputas laborales en los foros judiciales.** No obstante, la empleada no realizó algún acto afirmativo para preservar su derecho. Ante su pasividad, el foro apelativo intermedio federal determinó que ésta había consentido tácitamente al arbitraje, pues teniendo la oportunidad de rechazarlo, no lo hizo.[5]

Como vemos, el contexto del caso precitado es diametralmente distinguible al de autos. Aquí, Pfizer unilateralmente cambió los acuerdos que dieron base a la relación contractual con sus empleados de manera retroactiva. A pesar de la magnitud de tales cambios, Pfizer sólo se limitó a informar su decisión vía correo electrónico a los empleados. Contrario a Rivera Colón v. AT&T Mobility Puerto Rico, Inc., supra, Pfizer no ofreció la opción a los

---

[5]El Hon. Juez Thompson en su ponencia destacó lo siguiente:

> Instead, AT&T said that "[t]he decision on whether or not to participate [was Rivera's] to make," and that if she didn't want to participate in this alternative dispute resolution mechanism, **she could opt out** by following two links: one in the email, and one in the webpage the email link opened. **There were no consequences for opting out** except, of course, that Rivera couldn't force AT&T to arbitrate its claims against her. Rivera Colón v. AT&T Mobility Puerto Rico, Inc., supra, pág. 204.

recurridos de excluirse del programa de arbitraje antes de que entrara en efecto.

De hecho, de las comunicaciones emitidas por Pfizer en torno al programa de arbitraje, se puede apreciar que los recurridos no tenían poder alguno de negociación para alterar los términos del arbitraje o incluso rechazarlo para preservar su acceso a los tribunales. Ello demuestra que el alegado acuerdo no fue producto de una negociación, sino más bien un "lo tomas o lo dejas", teniendo Pfizer el control total sobre la capacidad de decisión del empleado.[6] Esto, al condicionarle su permanencia en el empleo a su consentimiento al arbitraje. La imposición unilateral y retroactiva de la cláusula de arbitraje, lejos de ser voluntaria, resultó ser obligatoria.

Con este proceder, Pfizer, avalado por una Mayoría de este Tribunal, atentó contra los principios contractuales y laborales que permean nuestro ordenamiento jurídico.

---

[6]El proceder de Pfizer se acerca más al dictamen emitido por el Noveno Circuito de Apelaciones Federal. Allí, el tribunal invalidó un convenio de arbitraje al caracterizarlo como un contrato de adhesión inexigible, creado por la parte más fuerte de los contratantes y ofrecido en calidad de "tómalo o déjalo", porque los términos fueron impuestos sobre la parte más débil, la cual, si deseaba hacer negocios, no tenía otra opción que aceptarlos. De acuerdo con el análisis de la corte, un convenio de arbitraje en un contrato de adhesión será inexigible si reúne las siguientes condiciones: primero, que el contrato sea el resultado de una negociación forzada entre partes con capacidades disímiles. Y, segundo, que el contrato limite injustamente las obligaciones y responsabilidades o provea grandes ventajas a la parte contratante más poderosa. Véase, Circuit City Stores, Inc. v. Adams, 279 F. 3d 889, 893-894 (2002).

Por otro lado, el que exista una política pública a favor del arbitraje no debe interpretarse como una preferencia absoluta por ésta sobre cualquier otra política pública o interés del Estado. La forma en la que Pfizer impuso el programa de arbitraje a los empleados es contraria al orden público, pues, según se discutió, el derecho y la protección al trabajo representan un interés social dominante por su trascendencia como un elemento central de la vida en sociedad. Ello ha inspirado la creación de una política pública laboral que protege a los trabajadores del capricho y el abuso patronal. En ese sentido, la acción estratégica de Pfizer de colocar a los empleados en una posición desventajosa, creando una disyuntiva al obligarlos a decidir entre "consentir" al arbitraje para permanecer en la empresa o rechazarlo y renunciar al empleo, es diametralmente contraria al orden público.

A su vez, en la imposición de la cláusula de arbitraje tampoco está presente el elemento del consentimiento por parte de los empleados. Sobre éste extremo, el récord está huérfano de evidencia que demuestre fehacientemente que todos los recurridos intencionalmente decidieron cumplir con esa disposición y que, por tanto, renunciaron a su derecho a acudir a los tribunales voluntariamente y a sabiendas de lo que ello implicaba.[7] Sobre este particular,

_____

[7]Surge del expediente que varios empleados, los cuales no firmaron el acuse de recibo y continuaron trabajando para Pfizer, le comunicaron a dicha compañía que no estaban de acuerdo con el contrato de arbitraje.

recordemos que para la prestación del consentimiento, sea tácito o explícito, éste tiene que surgir de manera libre, espontánea y con completo conocimiento sobre lo que se está haciendo.[8] De modo que la obligatoriedad de la cláusula impide, a su vez, que se cumpla con el requisito de voluntariedad, principio cardinal del arbitraje. **Por ende, no estamos ante un contrato que sea exigible contra los recurridos.**

Ello, máxime, ante nuestro deber de interpretar liberalmente las leyes laborales cuando le benefician al obrero y restrictivamente cuando le afectan. De esta forma, la renuncia o exclusión de un empleado de los beneficios de la legislación laboral "debe ser clara y debe interpretarse restrictivamente". López Santos v. Tribunal Superior, supra; López Vega v. F. Vega Otero, Inc., supra.

Soy del criterio que los patronos no deben pretender introducir enmiendas relevantes que inciden sobre los derechos laborales de sus empleados —como lo es una al contrato de empleo que presenta una nueva política de arbitraje— por medio de notificaciones enviadas por correo electrónico y procurar que, por una alegada conducta pasiva del empleado —continuar en su puesto tras recibir dicha notificación—, éstas sean vinculantes.

---

[8]Véase J.R. Vélez Torres, Curso de derecho civil: derecho de contratos, San Juan, Facultad de Derecho de la Universidad Interamericana, 1990, T. V, Vol. II, pág. 45.

**Dado el escenario fáctico de esta controversia, es forzoso concluir que, ante la gran cantidad de dudas sobre la validez, la voluntariedad y el consentimiento de los empleados a un procedimiento de arbitraje cuyo principal efecto es obviar el trámite laboral sumario de la Ley Núm. 2, _supra_, debimos haber extendido el manto protector del estatuto para permitirle a los empleados proseguir su reclamación ante el foro judicial.** Dicho curso es cónsono con el derecho laboral vigente y cumple con preservar la política pública del Estado de facilitar que los empleados insten reclamaciones de índole laboral en contra de sus patronos. Concluir lo contrario supondría obviar la política pública laboral puertorriqueña y sus normas especiales de hermenéutica.

Por último, la Opinión mayoritaria aduce que, con la puesta en vigor del arbitraje, los recurridos conservaron sus derechos sustantivos laborales. Discrepo.

Mediante la imposición de su nueva política de arbitraje, Pfizer privó a sus empleados del principal instrumento procesal para ventilar sus reclamaciones: el procedimiento sumario bajo la Ley Núm. 2, _supra_. En su lugar, se les requiere someterse a un procedimiento de arbitraje que no adelanta el objetivo de facilitar la solución de disputas por una vía más rápida, flexible y menos onerosa que los tribunales. Máxime cuando éste acarrea condiciones que potencialmente restringen el acceso a

remedios laborales y judiciales de empleados que no tuvieron la opción de una negociación con el patrono.

De un examen del procedimiento de arbitraje diseñado por Pfizer, se desprende que el empleado, a diferencia del proceso judicial bajo la Ley Núm. 2, supra, tendría que incurrir en un gasto monetario para iniciar su reclamación. Además, tendría que sufragar su representación legal y no tiene la garantía de que, de prevalecer, Pfizer le compensará los honorarios de abogado. De modo que el arbitraje representa para los recurridos un procedimiento más oneroso en comparación con aquel establecido en la Ley Núm. 2, supra. De hecho, éste le impone las barreras al acceso a la justicia que dicho estatuto pretendió derribar. Sostengo que éste proceder, avalado por una Mayoría de esta Curia, supedita la tramitación de reclamaciones laborales a un asunto estrictamente económico, cuyas repercusiones recaerán sobre la parte que estamos llamados a proteger: los empleados.

Como cuestión de hecho, mediante mi disenso en Méndez Jiménez v. Carso Const., 202 DPR 554 (2019) (Sentencia), advertí de la peligrosidad de que la política pública de favorecer a los empleados y obreros en sus reclamaciones laborales quedara soslayada, mediante la imposición de una primacía indebida de la política pública del arbitraje. Más aún en situaciones en donde el empleado impugna la validez de un convenio de arbitraje impuesto unilateralmente y de

manera retroactiva por el patrono. A esos efectos expresé que:

> **Adoptar esta práctica equivaldría a avalar que los patronos inserten unilateralmente cláusulas de arbitraje en los contratos de empleo con condiciones onerosas que obstaculizan el acceso a la justicia y a los remedios laborales. Lo anterior, como un subterfugio para no someterse a los procesos que exige la Ley Núm. 2 y permitir que los empleados se queden desprovistos de tales protecciones. Debe resultarnos alarmante que algunos patronos se aprovechen de la necesidad de empleo que existe en nuestra jurisdicción para incluir este tipo de cláusula en los contratos laborales que mina sustancialmente los derechos estatutarios.** Íd., pág. 575.

Lamentablemente, hoy las preocupaciones esgrimidas en aquel disenso se tornan en jurisprudencia normativa en nuestro ordenamiento jurídico laboral. Ello, con la consecuencia agravante de que, a partir de la Opinión que emite una Mayoría de este Tribunal, los patronos en Puerto Rico tendrán vía libre para, so color de adelantar la política pública del arbitraje laboral, imponer en cualquier momento y de forma unilateral cláusulas de arbitraje con condiciones onerosas que limiten severamente las posibilidades de acceso a remedios laborales y judiciales. Ello, en perjuicio de empleados con contratos individuales de empleo que no tienen el beneficio de una negociación colectiva de sus condiciones de empleo. Peor aún, se les envía el mensaje a los empleados de que, ante una situación similar a la de autos, tienen dos (2) alternativas fatales: (1) renunciar a sus derechos y protecciones laborales o (2) renunciar a su empleo.

Nuestro ordenamiento jurídico está diseñado, precisamente, para prever y prevenir prácticas injustas por parte del patrono hacia sus empleados. Desafortunadamente, la decisión que hoy emite una Mayoría tiene un efecto diametralmente contrario. Por ello, disiento.

**IV**

Por todo lo anterior, reafirmo que procedía confirmar parcialmente al Tribunal de Apelaciones. En consecuencia, hubiese ordenado la devolución del caso al Tribunal de Primera Instancia para que, en vez de determinar la voluntariedad del procedimiento de arbitraje, dilucidara en sus méritos las reclamaciones laborales de los recurridos.

Luis F. Estrella Martínez
Juez Asociado